**Elease THORNTON, Plaintiff–Appellant,**

v.

**SOUTHWEST DETROIT HOSPITAL, Defendant–Appellee.**

**No. 89–1398.**

United States Court of Appeals, Sixth Circuit.

Argued Dec. 4, 1989.

Decided Feb. 9, 1990.

Donnelly W. Hadden (argued), Donnelly W. Hadden, P.C., Detroit, Mich., for plaintiff-appellant.

Dale L. Hebert (argued), Richard Boothman, Boothman, Hebert & Eller, Detroit, Mich., for defendant-appellee.

Before MARTIN, JONES and GUY, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

Elease Thornton appeals the district court's grant of summary judgment to the defendant, Southwest Detroit Hospital, in her action under the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd. For the reasons stated below, we affirm the judgment of the district court.

Elease Thornton suffered a stroke on August 27, 1987. Elease Thornton initially was taken to Redford Community Hospital, but she was transferred to the Southwest Detroit Hospital emergency room, which admitted her to its Intensive Care Unit. She spent ten days in the Hospital's Intensive Care Unit and 11 more days in regular in-patient care. On September 16, 1987, her doctor planned to have her admitted into the Detroit Rehabilitation Institute for post-stroke rehabilitation therapy. The Detroit Rehabilitation Institute refused to accept Elease Thornton because her health insurance would not cover the cost. Instead, Elease Thornton's doctor discharged her from the Hospital to her sister's home for basic home nursing care. After the discharge, Elease Thornton's condition deteriorated until she finally gained admission to the Detroit Rehabilitation Institute on December 23, 1987.

Elease Thornton brought this action under the Emergency Medical Treatment and Active Labor Act. 42 U.S.C. § 1395dd. She alleges that she suffered from an emergency medical condition when she entered the Hospital and that the Hospital failed to stablize her condition before discharging her as required by the Act. *Id.* The Act requires hospitals to give emergency aid to indigent patients who suffer from an "emergency medical condition" or "active labor." American hospitals have a long tradition of giving emergency medical aid to anyone in need who appeared on the emergency room doorstep. Many hospitals have abandoned this tradition under modern pressures to cut costs or increase profits. Congress enacted the Act in order to preserve and restore this tradition by preventing hospitals from dumping patients, who lack insurance to pay for their claims, by either refusing treatment or transferring them to other hospitals. *See generally*, Note, *Preventing Patient Dumping: Sharpening the COBRA's Fangs*, 61 N.Y. U.L.Rev. 1186 (1986).

■ A preliminary question is whether federal courts have subject matter jurisdiction to hear cases brought under the Act. 28 U.S.C. § 1331. Although the parties did not address this issue, subject matter jurisdiction may be raised *sua sponte* at any juncture because a federal court lacks authority to hear a case without subject matter jurisdiction. Fed.R.Civ.P. 12(h)(3). Federal district courts have subject matter jurisdiction in "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Act creates a private right of action under federal law in 42 U.S.C. § 1395dd(d)(3)(A), stating:

> Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

Although this language clearly creates a private cause of action, it is silent as to whether that cause of action may be brought in federal court.

■ Federal courts have jurisdiction under section 1331 in "only those cases in which a well-pleaded Complaint establishes either that federal law creates the cause of action or that the plaintiffs right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 27–28, 103 S.Ct. 2841, 2856, 77 L.Ed.2d 420 (1983). The private cause of action created by the Act meets each of the alternative prongs of the *Franchise Tax* test. First, the action depends upon "resolution of a substantial question of federal law." *Id,* at 27–28, 103 S.Ct. at 2856. A plaintiff under the Act must show that she was suffering from an "emergency medical condition" and that the defendant transferred her before it had "stabilized" her within the meaning of the Act. 42 U.S.C. § 1395dd. Second, Congress has created a new, federal cause of action. *Franchise Tax,* 463 U.S. at 27–28, 103 S.Ct. at 2855–2856. A cause of action

under the Act is not analogous to a state medical malpractice claim because it creates liability for a refusal to treat, which state malpractice law does not. Under either prong of the *Franchise Tax* test, a cause of action under the Act arises under federal law.

In addition, ample evidence shows that Congress intended for federal courts to have jurisdiction over actions brought under the Act. *See Bryant v. Riddle Memorial Hospital,* 689 F.Supp. 490, 493 (E.D. Pa.1988). The House Committee on Ways and Means, to which H.R. 3128, the bill that eventually became the Act, was referred, stated:

> Any persons or entity adversely and directly affected by a participating hospital's violation of these requirements may bring an action, *in an appropriate state or federal court,* for damages to the person arising from the violation....

H.R.Rep. No. 241(I) 99th Cong., 1st Sess. 28, *reprinted in* 1986 U.S.Code Cong. & Admin.News 42, 606 (emphasis added). The House Judiciary Committee, which fully considered and revised portions of H.R. 3128, also intended that a federal cause of action would be created. H.R.Rep. No. 241(III) 99th Cong., 1st Sess. 6–7, *reprinted in* 1986 U.S.Code Cong. & Admin.News 728–29. Indeed, the Judiciary Committee explicitly rejected an amendment that would have stricken the new federal cause of action by a roll call vote. H.R.Rep. No. 241(III) 99th Cong., 1st Sess., 9, *reprinted in* 1986 U.S.Code Cong. & Admin.News 731. There can be no doubt that federal courts have subject matter jurisdiction in suits brought under the Act.

■ Having held that federal courts have subject matter jurisdiction in cases brought under the Act, we turn to the merits of Elease Thornton's appeal. The parties do not dispute that Elease Thornton suffered from an "emergency medical condition" when she entered the Hospital emergency room. In section 1395dd(e)(1), the Act defines an "emergency medical condition" as:

a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(A) placing the patient's health in serious jeopardy,

(B) serious impairment to bodily functions, or

(C) serious dysfunction of any bodily organ or part.

Under this definition, a patient suffers from an emergency medical condition if she is in imminent danger of death or serious disability. Immediately after suffering a stroke, Elease Thornton suffered from an emergency medical condition.

■ The key question is whether the Hospital violated the Act by releasing Elease Thornton before her condition "stabilized." The term, "stabilized," means that "no material deterioration of the condition is likely, within reasonable medical probability, to result from the transfer of the individual from a [hospital]." 42 U.S.C. § 1395dd(e)(4)(B). The district court found that no genuine issue of material fact existed as to whether—after a three week stay in the Hospital—Elease Thornton's condition had stabilized sufficiently for release. The district court stated that the Act was not intended to require hospitals to bring patients to complete recovery, but to require hospitals to give emergency room treatment.

The Act requires hospitals to screen individuals who come to a "hospital emergency department" to determine whether they suffer from an emergency medical condition. 42 U.S.C. § 1395dd(a). Once a patient is found to suffer from an emergency medical condition, the hospital must give the patient treatment to stabilize that condition unless the patient can be transferred without danger of the patient's condition deteriorating. 42 U.S.C. § 1395dd(b), (c). The Act states that the screening must be done for patients who come to a "hospital emergency room," and that the "hospital" must give the stabilizing treatment. The rules of statutory construction suggest

that this change in wording indicates a change in meaning. *See Guarantee Title & Trust Co. v. Title Guaranty & Surety Co.*, 224 U.S. 152, 32 S.Ct. 457, 56 L.Ed. 706 (1912). The reasonable inference from this change in wording is that once a patient is found to suffer from an emergency medical condition in the emergency room, she cannot be discharged until the condition is stabilized, regardless of whether the patient stays in the emergency room.

The legislative history of the Act supports this literal interpretation, although it is sparse because it was passed as part of the huge Comprehensive Omnibus Budget Reconciliation Act, P.L. 99–272. The only clear guidance from the legislative history is that Congress intended to prevent hospitals from dumping patients who suffered from an emergency medical condition because they lacked insurance to pay the medical bills. In H.R.Rep. No. 241(I), 99th Cong., 1st Sess. 27, *reprinted in* 1986 U.S. Code Cong. & Admin.News, 42, 605 (emphasis added), the House Committee on Ways and Means reported as follows:

The Committee is greatly concerned about the increasing number of reports that *hospital emergency rooms* are refusing to accept or treat *patients with emergency conditions* if the patient does not have medical insurance. The Committee wants to provide a strong assurance that pressures for greater hospital efficiency are not to be construed as license to ignore traditional responsibilities and loosen historic standards.

In H.R.Rep. No. 241(III), 99th Cong., 1st Sess. 6, *reprinted in* 1986 U.S.Code Cong. & Admin.News, 42, 726–727 (emphasis added), the House Judiciary Committee, which considered the enforcement mechanisms of the Act, noted generally:

In recent years there has been a growing concern about the provision of *adequate emergency room services* to individuals who seek care, particularly as to the indigent and uninsured. Although at least 22 states have enacted statutes or issued regulations requiring the provision of limited medical services whenever an *emergency situation* exists, and despite the fact that many state court rul-

ings impose a common law duty on doctors and hospitals to provide *necessary emergency care,* some are convinced that the problem needs to be addressed by federal sanctions.... The Judiciary Committee shares the concern of The Ways and Means Committee that *appropriate emergency room care* be provided to patients faced with *medical emergencies and active labor.*

The Hospital argues that the repeated use of the phrase, "emergency room," in these statements indicates that Congress intended that the requirement to care for a patient not extend to where the patient was admitted to the hospital. A fairer reading is that Congress sought to insure that patients with medical emergencies would receive emergency care. Although emergency care often occurs, and almost invariably begins, in an emergency room, emergency care does not always stop when a patient is wheeled from the emergency room into the main hospital. Hospitals may not circumvent the requirements of the Act merely by admitting an emergency room patient to the hospital, then immediately discharging that patient. Emergency care must be given until the patient's emergency medical condition is stabilized.

■ Here, the district court correctly found that Elease Thornton's condition had stabilized. Our holding is not based on the fact that Elease Thornton spent a "prolonged period" in the Hospital, but on the district court's finding that no genuine issue of material fact existed as to whether her condition had stabilized at the time of her release. The judgment of the district court is affirmed.

NATHANIEL R. JONES, Circuit Judge, concurring.

I agree with the majority that the Emergency Medical Treatment and Active Labor Act does not apply to the instant case, because Elease Thornton's "emergency medical condition" had stabilized. Thornton had received emergency care and stayed in the hospital for three weeks. Though she was ready for rehabilitation, she could not afford it. In this circumstance, the Act does not seem to apply to Thornton. The Act was designed to prevent hospitals from either turning down or "dumping" indigent patients. It was not a measure to force hospitals to provide long-term care for uninsured patients.

I write separately only to emphasize that the evidence of Thornton's condition presented by Southwest Detroit Hospital was barely adequate. Thornton claims that her medical symptoms at the time of discharge were "unstabilized," as evidenced by blood in the urine, I.V., a catheter, high blood pressure, and an inability to walk or care for herself. However, Thornton's personal and treating physician, Dr. Williamson, felt that her condition had stabilized enough to release her from the hospital. The record does not show any affidavits produced by Southwest to dispute Thornton's assertions that she had an unstabilized emergency medical condition at the time of her release. In a case as clearcut as this one, the lack of affadavits is not relevant, for the release by the physician is enough evidence. However, in future cases, I suggest that before deciding that there is no material issue of fact, the district court should examine affadavits as to the patient's condition. For the foregoing reasons, I respectfully concur in the court's decision.