Theresa McINTYRE, Personal Representative and Administratrix of the Estate of David Andrew McIntyre, Deceased,

and

Theresa McIntyre, Individually, and Charles McIntyre, Individually, Plaintiffs,

v.

Eduardo J. SCHICK, M.D., and Virginia Beach General Hospital, Defendants.

Civ. A. No. 2:91cv680.

United States District Court, E.D. Virginia, Norfolk Division.

June 16, 1992.

Thomas B. Shuttleworth, Judith M. Cofield, Shuttleworth, Ruloff, Giordano & Kahle, P.C., Virginia Beach, Va., for plaintiffs.

Jack B. Russell, Martha E. Withrow, Rilee, Cantor & Russell, P.C., Norfolk, Va., for defendant Eduardo J. Schick, M.D.

Carolyn P. Oast, Heilig, McKenry, Fraim & Lollar, Norfolk, Va., for defendant Virginia Beach General Hosp.

OPINION

REBECCA BEACH SMITH, District Judge.

This case came before the court on Defendant Virginia Beach General Hospital's

motion to dismiss Counts III and IV of Plaintiffs' Complaint and Defendant Schick's motion to dismiss Count IV of Plaintiffs' Complaint.[1] Following a hearing, the court denied Defendants' respective motions to dismiss.[2]

## I. Background

In their Complaint, Plaintiffs alleged that on November 1, 1989, at 7:15 p.m., Plaintiff Theresa McIntyre came to Virginia Beach General Hospital ("VBGH") "with labor contractions, persistent sinusoidal fetal heart patterns and lack of fetal beat-to-beat variability," seeking treatment from VBGH and Dr. Schick. (Second Am.Compl. at 3). Plaintiffs had no health insurance. (*Id.* at 2).

Plaintiff Theresa McIntyre allegedly remained at the hospital for approximately eleven hours and twenty-five minutes without being formally admitted. During this time, she continued to exhibit the same allegedly "ominous patterns," which, Plaintiffs contended, both VBGH personnel and Dr. Schick "failed to recognize, test or appropriately treat." (*Id.*) Plaintiffs alleged that VBGH had a policy in effect at that time that required admission of patients after twelve-hours stay at the hospital.[3] (*Id.* at 5).

Because of the foregoing, Plaintiffs contended that Theresa McIntyre was then negligently discharged at 6:40 a.m. on November 2, 1989, before her condition was stabilized. On November 2, 1989, at 11:15 p.m., Theresa McIntyre, allegedly exhibiting the same symptoms or patterns, again "presented" to VBGH. At this time Dr. Schick, who, according to Plaintiffs, belatedly recognized Theresa McIntyre's condition as serious, transferred her to Norfolk General Hospital, where she underwent a caesarian section. An anemic baby boy was born and died a few days later, allegedly as a direct and proximate result of Defendants' negligence. (*Id.* at 3–4).

As noted above, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant VBGH moved to dismiss Count III of the complaint, which alleged a violation of 42 U.S.C. § 1395dd, the patient anti-dumping provision of the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). Both Defendant VBGH and Defendant Schick moved to dismiss Count IV of the complaint, insofar as it applied to Plaintiff Charles McIntyre, the father of the deceased infant. Count IV made a claim for damages on behalf of both Mr. and Mrs. McIntyre for emotional distress.[4] No motions were made with respect to the other three counts of the complaint.[5]

## II. Standard for Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure requires the court to dismiss a plaintiff's complaint upon a defendant's motion if the complaint "[fails] to state a claim upon which relief can be

1. Plaintiffs twice amended their original Complaint, filed October 17, 1991. The First Amended Complaint was filed on December 6, 1991; the Second Amended Complaint was filed on January 2, 1992.

2. This case was subsequently settled out of court and dismissed with prejudice upon joint motion of the parties. However, because there is a dearth of case law dealing directly with the issues raised by Defendants' motions, the court reserved the option to render a written opinion based upon its ruling from the bench.

3. At oral argument, Defendant VBGH clarified this policy, stating that the policy was only in effect for maternity patients.

4. In Count IV of the original Complaint and the First Amended Complaint, only Mr. McIntyre asked for emotional distress damages. In the Second Amended Complaint, both Mr. and Mrs.

McIntyre, in their individual capacities, asked for emotional distress damages. *See supra* note 1. However, both Defendants' motions to dismiss were made immediately after the original Complaint was filed. The parties never amended their motions to dismiss, and in their supporting memoranda and in oral argument, the parties addressed only the issue of the legal propriety of a father recovering damages for emotional distress, upon the birth of a fatally defective infant. Accordingly, the court addressed only the portion of Count IV dealing with Mr. McIntyre's claim for emotional distress damages.

5. Count I alleged wrongful death pursuant to Va.Code § 8.01–50, *et seq.;* Count II alleged medical malpractice; and Count V made a claim for medical expenses.

granted." Fed.R.Civ.P. 12(b)(6). In deciding a 12(b)(6) motion to dismiss, the court accepts as true the facts alleged in the plaintiff's complaint. *E.g., Loe v. Armistead,* 582 F.2d 1291, 1292 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980); *see also Schatz v. Rosenberg,* 943 F.2d 485, 489 (4th Cir.1991) (in testing the legal sufficiency of a complaint, the court "construe[s] the factual allegations in the light most favorable to plaintiff"). " '[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *De Sole v. United States,* 947 F.2d 1169, 1177 (4th Cir.1991) (quoting *Coakley & Williams, Inc. v. Shatterproof Glass Corp.,* 706 F.2d 456, 457 (4th Cir.1983) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957))).

### III. COBRA Claim

■ The COBRA patient anti-dumping provision, 42 U.S.C. § 1395dd, was enacted to prevent hospitals from failing to treat individuals with emergency care needs when those individuals, who are often indigent, do not have medical insurance. *See* H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 1, at 27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 42, 605; H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. III at 6 (1986), *reprinted in,* 1986 U.S.C.C.A.N. 42, 727–728. *See also, Thornton v. Southwest Detroit Hospital,* 895 F.2d 1131, 1134–35 (6th Cir.1990) (discussing legislative history of § 1395dd); Karen I. Treiger, Note, *Preventing Patient Dumping: Sharpening the COBRA's Fangs,* 61 N.Y.U.L.Rev. 1186 (1986). Plaintiffs alleged that Defendants violated various provisions of subsections (b) and (c) of that provision.[6] First, Plaintiffs argued that Defendants violated subsections (b) and (c) by discharging[7] Mrs. McIntyre on November 1, 1989, before she was stabilized, because she had no insurance. Second, Plaintiffs charged that Defendants violated subsection (c)(1)(A)(ii) in transferring Mrs. McIntyre to Norfolk

---

6. The events resulting in this lawsuit took place in November, 1989; therefore, the court applied the statute in question, 42 U.S.C. § 1395dd, as it was written at that time. Although some changes have since been made in the wording of the statute, these changes, in pertinent part, are minor and do not affect the substantive application of the statute. Accordingly, the court's decision in this case would be the same under either the 1989 or the current statute.

In November 1989, Section 1395dd(b) and (c) provided in pertinent part:

§ 1395dd. Examination and treatment for emergency medical conditions and women in active labor

....

(b) Necessary stabilizing treatment for emergency medical conditions and active labor

(1) In general

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition or is in active labor, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition or to provide for treatment of the labor, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

....

(c) Restricting transfers until patient stabilized

(1) Rule

If a patient at a hospital has an emergency medical condition which has not been stabilized ... or is in active labor, the hospital may not transfer the patient unless—

(A)(i) the patient ... requests that the transfer be effected, or

(ii) a physician ... or other qualified medical personnel when a physician is not readily available in the emergency department, has signed a certification that, based upon the reasonable risks and benefits to the patient, and based upon the information available at the time, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual's medical condition from effecting the transfer; and

(B) the transfer is an appropriate transfer....

7. Section 1395dd(e)(5) included the term "discharge" in the definition of "transfer": "(5) The term "transfer" means the movement (including the discharge) of a patient outside a hospital's facilities at the direction of any person employed by ... the hospital...."

General without obtaining the necessary signed certification of a physician.

The sole basis for Defendant VBGH's motion to dismiss Count III was that Plaintiffs failed to plead, pursuant to § 1395dd(a), that Mrs. McIntyre presented to the emergency department of the hospital.[8] Accordingly, Defendant VBGH argued that Plaintiffs failed to state a claim upon which relief could be granted. The court disagreed and found that Plaintiffs' case, as pleaded in the complaint, fell squarely within the COBRA patient antidumping statute.

Although the court agreed that, under subsection (a), one would have to present to a hospital's emergency department in order to state a claim under that subsection, Plaintiffs did not plead their case under subsection (a), and the court reads subsection (a) separately from subsections (b) and (c). Nothing in the language of § 1395dd indicates that every other provision in the statute must be read in conjunction with subsection (a), and neither subsections (b) nor (c) refers back to the requirements of subsection (a). Moreover, subsection (b) never mentions the words "emergency department" or "emergency room." *See* 42 U.S.C. § 1395dd(b). The only reference to the "emergency department" in subsection (c) is made with respect to medical personnel permitted to sign a certification of patient transfer. *See* 42 U.S.C. § 1395dd(c)(1)(A)(ii).

Indeed, the wording of the statute is inclusive of individuals present in areas of the hospital other than the emergency room. Subsection (b) states that "[i]f *any* individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition *or* is in active labor, the hospital *must* provide either," within the facilities available at that hospital, further medical examination and treatment required to stabilize the condi-

tion or for appropriate transfer to another facility. 42 U.S.C. § 1395dd(b) (emphasis added). Likewise, subsection (c) precludes transfer, except in certain approved situations, of any "patient[, present] at a hospital[, who] has an emergency medical condition which has not been stabilized ... or [who] is in active labor." 42 U.S.C. § 1395dd(c)(1). Nowhere do subsections (b) and (c) state that an individual in an emergency medical condition or in active labor must enter through the emergency room. Nor does the statute state that such a person present in another department of the hospital first must be sent to the emergency room for a determination of that individual's status.

Furthermore, although the terms "emergency department" and "emergency room" were often used in the legislative history of § 1395dd, *e.g.*, H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 1, at 27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 42, 605; H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. III at 6 (1986), *reprinted in* 1986 U.S.C.C.A.N. 42, 727–728, other statements in the statute's legislative history demonstrate that legislators were concerned with protecting those in need of emergency medical care, not just those who presented to the emergency room of a hospital. *See, e.g.*, H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 1, at 27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 42, 605 ("The Committee is most concerned that medically unstable patients are not being treated appropriately."); 131 Cong. Rec. S13903 (daily ed. October 23, 1985) (statement of Sen. Durenberger) ("We cannot stand idly by and watch those Americans who lack the resources be shunted away from immediate and appropriate emergency care whenever and wherever it is needed.... [T]he Medicare program will not do business with any institution which willfully and knowingly, or through

---

**8.** 42 U.S.C. § 1395dd(a) provided in pertinent part:

In the case of a hospital that has a hospital emergency department, if any individual ... comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical con-

dition, the hospital must provide for an appropriate medical screening within the capability of the hospital's emergency department to determine whether an emergency medical condition ... exists or to determine if the individual is in active labor....

negligence, turns its back on an emergency medical situation").

The Sixth Circuit shares this court's view. In commenting on § 1395dd's legislative history, the court disagreed that the repeated use of the term "emergency room" indicated that Congress intended that the requirement to care for a patient in an emergency medical condition extended only to those entering through the emergency room. "A fairer reading is that Congress sought to insure that patients with medical emergencies would receive emergency care." *Thornton v. Southwest Detroit Hospital*, 895 F.2d 1131, 1135 (6th Cir.1990).

Although not directly on point, both the *Loss v. Song*, No. 89C 6952, 1990 WL 159612 (N.D.Ill. Oct. 16, 1990), and *Thornton* cases support this broader interpretation of the statute. In *Loss*, a baby whose mother had been admitted to the hospital was born with an emergency medical condition. The plaintiff's doctor released mother and child without first stabilizing the child. The child died soon thereafter from complications arising from his condition. In denying the defendant's motion to dismiss, the court held that the fact that the baby did not come in through the emergency room was not fatal to the COBRA complaint, and that a child with an emergency medical condition, born to a mother admitted to the hospital, must be treated under the provisions of COBRA. *Id.* at *4.

█ In *Thornton*, quoted *supra*, a patient came to the emergency room after suffering a stroke and was admitted to the hospital. She alleged that her condition was not stabilized while she was admitted, but that she was released anyway. The court held that the provisions of the CO-BRA anti-dumping statute applied to her, as well, stating:

Hospitals may not circumvent the requirements of the Act merely by admitting an emergency room patient to the hospital, then immediately discharging that patient. Emergency care must be given until the patient's emergency medi-

cal condition is stabilized.... Although emergency care often occurs, and almost invariably begins, in an emergency room, emergency care does not always stop when a patient is wheeled from the emergency room into the main hospital. *Id.* at 1135. Both *Loss* and *Thornton* demonstrate that the rationale behind the CO-BRA patient anti-dumping statute is not based upon the door of the hospital through which a patient enters, but rather upon the notion of proper medical care for those persons suffering medical emergencies, whenever such emergencies occur at a participating hospital. Indeed, it is a ridiculous distinction, one which places form over substance, to state that the care a patient receives depends on the door through which the patient walks.[9]

The court found that the situation described in the pleadings was exactly the sort of situation that the COBRA patient anti-dumping provision was intended to prevent. Theresa McIntyre, who had no health insurance, presented to VBGH in an alleged state of fetal distress. She was kept at the hospital, which had a twelve-hour admissions policy for maternity patients, without being admitted for approximately eleven and a half hours, at which time she was discharged. Accordingly, based upon the court's reading of 42 U.S.C. § 1395dd and upon the pleadings, the court DENIED Defendant VBGH's motion to dismiss Count III of Plaintiffs' Second Amended Complaint.

### IV. Emotional Distress Claim

█ Defendants Schick and VBGH argued that Plaintiff Charles McIntyre failed to state a claim for emotional distress damages. The general rule in Virginia is that recovery for emotional distress is not permitted unless it results directly from "tortiously caused physical injury." *Naccash v. Burger*, 223 Va. 406, 414, 290 S.E.2d 825, 831 (1982). However, numerous exceptions to this rule have evolved over time. *See Boyd v. Bulala*, 877 F.2d 1191 (4th Cir. 1991) (upholding award to father of com-

---

9. In fact, at the hearing, Defendant VBGH admitted that, had she entered through the emer- gency room, Theresa McIntyre probably would have been taken to Labor and Delivery anyway.

pensatory damages for emotional distress upon the birth of a defective child); *Naccash v. Burger,* 223 Va. 406, 290 S.E.2d 825 (1982) (allowing a claim for emotional distress damages in a negligence claim for medical malpractice); *Womack v. Eldridge,* 215 Va. 338, 210 S.E.2d 145 (1982) (allowing recovery of emotional distress damages in the absence of physical injury where certain criteria are met); *Hughes v. Moore,* 214 Va. 27, 197 S.E.2d 214 (1973) (allowing recovery for non-impact-related negligent infliction of emotional distress where physical injury resulted). This court found that the instant suit fell squarely within the exception carved out by *Naccash,* as interpreted by the Fourth Circuit in *Boyd.*

In the *Naccash* case, a suit for negligent medical malpractice, in essence a wrongful birth suit, a father's blood was drawn and negligently mislabeled, leading to the father's false negative test result for the gene for the invariably fatal disease, Tay–Sachs. On the basis of the false negative test result, the plaintiffs decided to carry their child to term. The child later developed Tay–Sachs and died. The court allowed the wrongful birth cause of action on behalf of the parents, and further held that *both* parents could recover for their emotional distress. 223 Va. at 416, 290 S.E.2d at 831. The court specifically stated that it was creating an exception to the general rule and that the restrictions set forth in the *Womack* and *Hughes* cases did not apply:

> The restrictions upon recovery imposed by the provisos in *Hughes* and *Womack* were designed to discourage spurious claims asserted by chance witnesses to physical torts involving others. The considerations prompting imposition of the limitations do not exist here; no one suggests that the Burgers' emotional distress was feigned or that their claim was

fraudulent. Indeed, to apply their restrictions here, or to refuse to recognize an exception to the general rule, "would constitute a perversion of fundamental principles of justice."

*Naccash,* 223 Va. at 416, 290 S.E.2d at 831 (citations omitted).

The facts in *Boyd,* a medical malpractice action, are very similar to the facts in the case at hand. The doctor in *Boyd* negligently failed properly to attend to the mother during both the pre-natal and labor stages of her pregnancy. As a result, the fetus was distressed during labor and suffered a number of birth defects. The infant ultimately died after the trial, but before the appeal. The Fourth Circuit in *Boyd* recognized the *Naccash* exception to allow recovery for emotional distress to both parents, mother and father, as people who would not be feigning emotional distress:

> In such a situation, the Court reasoned, it was "wholly unrealistic" to view the parents as "mere witnesses to the consequences" of the physician's tortious conduct, and there was little reason to fear that their distress was feigned or that their claim was fraudulent.
>
> We think Roger Boyd's claim fits well within the bounds of the *Naccash* exception. . . .

*Boyd,* 877 F.2d at 1198 (citations omitted). The Fourth Circuit seemed to find in *Naccash* that the duty of the obstetrician ran both to the father and to the mother.[10] Accordingly, based on the pleadings in this case and on the Fourth Circuit's ruling in *Boyd* and its interpretation of Virginia law as set forth in *Naccash,* the court found that Plaintiff Charles McIntyre had stated a claim for relief for emotional distress and DENIED Defendants' motions to dismiss

---

**10.** As noted *supra,* the instant case was strikingly similar to the *Boyd* case. Defendants argued that there were some crucial factual differences between the two cases, most notably, that the father in *Boyd* engaged the obstetrician, whereas Mr. McIntyre did not. The court found this to be an absurd distinction and did not believe that *Boyd* rises and falls on the basis of that distinction. As stated in the text of this opinion, the courts in both *Naccash* and *Boyd* seemed to find that the doctor's duty ran to both parents. It would be unfair and unrealistic to believe that only a mother suffers emotional distress upon the birth and/or death of a defective child. Accordingly, it would be equally unfair to permit only the mother to recover damages for emotional distress in such a situation.

Count IV of Plaintiffs' Second Amended Complaint.