**Janie Patterson SMITH, Administratrix of the Estate of Harold L. Smith, Sr., on Behalf of All Heirs of Said Deceased, Plaintiff,**

v.

**Dr. Julian JANES, Southwest Mississippi Regional Medical Center, Defendants.**

Civ. A. No. 3:93–CV–689WS.

United States District Court,
S.D. Mississippi,
Jackson Division.

March 31, 1995.

Edwin L. Bean, Jr., McComb, MS, for plaintiff.

George Q. Evans, Robert Mark Hodges, Jackson, MS, Whitman B. Johnson, III, Jackson, MS, for defendants.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

Before the court is the motion of the defendants pursuant to Federal Rules of Civil Procedure 56(b)[1] for summary judgment on the plaintiff's claims filed under 42 U.S.C. § 1395dd, Emergency Medical Treatment and Active Labor Act ("EMTALA"), enacted as a part of COBRA—the Consolidated Omnibus Budget Reconciliation Act of 1986. Pub.L. No. 99–272, § 9121, 100 Stat. 82, 164–67 (1986).[2] Plaintiff alleges that on October 20, 1991, the defendants violated EMTALA by improperly treating, failing to stabilize, and inappropriately transferring the decedent, Harold Smith ("Smith"), when he presented himself for treatment at Southwest Mississippi Regional Medical Center ("Southwest"). The defendants here are Dr. Julian Janes ("Dr. Janes") and Southwest. Each defendant asks the court to be dismissed from this lawsuit. Dr. Janes contends that EMTALA does not create a private cause of action against physicians, which means, says Dr. Janes, that plaintiff's claims against him must fail. In response to the plaintiff's claims that Southwest violated EMTALA, Southwest argues that the undisputed facts show that Dr. Janes examined/screened Smith to determine whether he had an emergency medical condition, then once it was determined that Smith had an emergency medical condition he was stabilized and transferred to the Delta Regional Burn Center ("burn center") in Greenville, Mississippi. Southwest contends that at all times its actions were totally in compliance with the requirements of EMTALA. Hence, both defendants here ask the court to grant summary judgment in their favor. Plaintiff contests the motion and has submitted her arguments and case authorities in opposition. Having reviewed the motion and memoranda of the parties, this court is persuaded to grant the defendants' motion in part and to deny the motion in part.

## I. PARTIES

The plaintiff, Janie Patterson Smith, is the duly authorized Administratrix of the Estate of Harold L. Smith, Sr., deceased. She files this suit in her representative capacity on behalf of all known heirs of Harold L. Smith, Sr., namely his wife, Janie Patterson Smith; and four adult children, Sandra S. Anderson, Harold Lynn Smith, Jr., Novel S. Turnage, and Beth Smith, and one minor, Angela Smith. Harold L. Smith, Sr., died intestate while being an adult resident citizen of Pike

---

1. Rule 56(b) of the Federal Rules of Civil Procedure provides:

    (b) For Defending Party. A party against whom a claim, counterclaim or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

2. "Congress enacted the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, to end 'patient dumping.' 'Patient dumping' refers to the practice of a hospital that, despite being capable of providing the needed medical care, transfers patients to another institution or refuses to treat patients because the patient is unable to pay." *Delaney v. Cade*, 986 F.2d 387, 391–92, n. 5 (10th Cir.1993).

County, Mississippi. The administratrix, Janie Patterson Smith, is an adult resident citizen of Pike County, Mississippi.

The defendant, Dr. Julian Janes, was a duly licensed and practicing physician in the State of Mississippi at the time this cause of action arose, and, presently, is practicing general medicine as Julian Janes, M.D., in McComb, Pike County, Mississippi.

The defendant, Southwest Mississippi Regional Medical Center, is a public hospital chartered under the laws and statutes of the State of Mississippi and accepts process in McComb, Mississippi.

## II. JURISDICTION

Since plaintiff seeks redress under EMTALA, a Congressional enactment, this court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331.[3]

## III. FACTS

On October 20, 1990, Smith was critically injured at his home in McComb, Mississippi, while he was cutting scrap metal with a blow torch when an automobile gas tank exploded. Smith was transported by ambulance from his home to Southwest, also located in McComb, Mississippi. Dr. Janes was on duty in the emergency room when Smith was presented for treatment. Upon Smith's arrival at Southwest, Dr. Janes ordered hospital staff to perform diagnostic tests on Smith's blood. In addition to the blood work, Dr. Janes examined Smith. Dr. Janes testified in his deposition: that he found that Smith had suffered first and second degree burns to his face and upper torso; that he looked into Smith's oropharynx and nasal passages, but he found no evidence of burn inside Smith's nasal passage; that he listened to Smith's chest and determined that his lungs were clear; and that he found Smith's circulation was adequate, but that Smith's blood pressure, however, was elevated, as was his heart rate. Dr. Janes concluded from all these findings that Smith had an emergency medical condition.

After examining Smith, Dr. Janes decided to treat Smith's ailments by continuing Smith's intravenous fluids which paramedics started when they picked Smith up at his home. Dr. Janes also continued Smith's oxygen and provided medication (i.e. two doses of morphine) to ease Smith's pain. Additionally, Dr. Janes decided to monitor Smith's urinary output. Dr. Janes did not consult with any physicians during his examination and treatment of Smith.

Apparently, Dr. Janes determined that Smith's major medical problems were the burns he had sustained and that those burns could be treated better at a facility which specialized in treating such injuries. Southwest did not have a burn unit, so Dr. Janes telephoned the burn center in Greenville to inquire about transferring Smith. Dr. Janes spoke to a nurse at the burn center. After consulting with the burn center's on-call physician, the nurse informed Dr. Janes that the burn center would accept the transfer.

Dr. Janes then summoned an ambulance for the transfer. Three medical personnel, the ambulance driver, a paramedic and a registered nurse, accompanied Smith on the trip to Greenville. Dr. Janes sent a cellular telephone with the crew so he could communicate with them during the transfer. Before the ambulance left Southwest with Smith, Dr. Janes made a notation in Smith's medical records, which were sent to the burn center, that Smith's condition was "good." In his deposition, Dr. Janes testified that "good" means "stable."

About thirteen minutes after leaving Southwest, Smith began to have problems breathing. Although the ambulance had passed Vicksburg, Mississippi, Dr. Janes and ambulance personnel decided that they should return to the Vicksburg Medical Center ("Medical Center") in Vicksburg. While at the Vicksburg Medical Center, Smith was intubated to prevent potential problems with his breathing. A respiratory therapist also joined the medical crew for the remainder of the trip so she could monitor Smith's mechanically-assisted breathing.

3. Title 28 U.S.C. 1331 provides: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

When the ambulance carrying Smith arrived at the burn center, Smith's medical condition had materially deteriorated. Smith was unconscious and remained unconscious for 28 days. On November 28, 1991, Smith died.

## IV.  *DISCUSSION*

In the 1980s, reports of hospitals across the United States refusing to treat, or transferring uninsured individuals to other facilities reached an alarming level. To combat this practice, commonly known as "patient dumping," Congress enacted EMTALA. *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1039 (D.C.Cir.1991), citing H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 1, at 27 (1985) *id.,* pt. 3 at 5; and *Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266, 268 (6th Cir.1990). EMTALA requires hospitals which execute Medicare agreements pursuant to 42 U.S.C. § 1395cc to screen individuals for emergency medical conditions and to stabilize individuals if an emergency medical condition is found, or to transfer unstabilized individuals upon the individual's request or a physician's certification that the medical benefits expected at the other facility outweigh the increased risk to the individual. 42 U.S.C. § 1395dd(a), (b), and (c); *Burditt v. U.S. Dept. of Health and Human Services,* 934 F.2d 1362, 1368–71 (5th Cir.1991).

Defendants' motion for summary judgment asks the court to address four issues: (1) whether EMTALA creates a private cause of action against physicians; (2) whether Southwest appropriately screened Smith when he was presented for treatment; (3) whether Southwest failed to stabilize Smith before transporting him to the burn center; and (4) whether Southwest's decision to transfer Smith by ambulance was appropriate. Of course, the court's consideration of these issues under Rule 56 is guided by certain established precepts.

### A.  *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." In *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), the United States Supreme Court held that the Rule 56(c) language "mandates the entry of summary judgment ... against a party who fails to make sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *See Moore v. Miss. Valley State University,* 871 F.2d 545, 549 (5th Cir.1989); *Washington v. Armstrong World Industries, Inc.,* 839 F.2d 1121, 1122 (5th Cir.1988).

The party requesting summary judgment bears the initial burden of informing the court of the basis for its motion for summary judgment and of providing evidence to the court that there is no issue as to any fact material to the outcome of the litigation. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. The non-moving party then bears the responsibility of designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553.

### B.  *Whether EMTALA Creates Private Cause Of Action Against Physicians*

Plaintiff fails to point this court to any authority to support her contention that EMTALA creates a private cause of action against physicians. Conversely, in support of their contention to the contrary, that EMTALA did not create a private cause of action against physicians, the defendants cite a litany of cases in which this court and other courts have held that § 1395dd creates no private cause of action against physicians. *Richardson v. Southwest, et al.,* 794 F.Supp. 198, 201 (S.D.Miss.1992); *Baber v. Hospital Corp. of America,* 977 F.2d 872, 877 (4th Cir.1992); *Delaney v. Cade,* 986 F.2d 387, 393 (10th Cir.1993); *Urban v. King,* 783 F.Supp. 560, 562–63 (D.Kan.1992); *Gatewood v. Washington Healthcare Corporation,* 933 F.2d 1037, 1040 (D.C.Cir.1991); *Lavignette v. West Jefferson Medical Center,* Civil Action No. 89–5495, 1990 WL 178708 1990 U.S.Dist.

LEXIS 14966 at 4 (E.D.La.1990); and *Verhagen v. Olarte*, No. 89, Civil Action No. 0300(CSH), 1989 WESTLAW No. 146265 at 13, 14 (S.D.N.Y. Nov. 21, 1989).

The provisions for the civil enforcement of EMTALA are found in § 1395dd(d)(1) and § 1395dd(d)(2). Section 1395dd(d)(1) empowers the United States Department of Health and Human Services ("DHHS"), upon the authorization of the Attorney General of the United States, to initiate administrative proceedings for civil penalties against hospitals and physicians that negligently violate EMTALA. *See Burditt v. U.S. Dept. of Health and Human Services*, 934 F.2d 1362 (5th Cir.1991), (U.S. Department of Health and Human Services ("DHHS"), the government agency responsible for enforcing the Medicare provider agreement, filed an administrative claim for civil penalties against a hospital and physician for EMTALA violations pursuant to § 1395dd(d)(1)). If successful against either the violating hospital or physician, DHHS may resort to the administrative hearing route and recover civil money penalties contingent upon a weighing of the aggravating or mitigating circumstances by the administrative law judge. The aggrieved hospital or physician has a right of appeal to the United States Court of Appeals. *Burditt*, 934 F.2d at 1367.

Section 1395dd(d)(2) has a different mission than § 1395dd(d)(1); § 1395dd(d)(2) allows individuals alleging personal harm to sue for EMTALA violations, but the statute limits who these patients may sue. Section 1395dd(d)(2) provides:

**(2) Civil Enforcement**

(A) Personal harm

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the *participating hospital*, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate. (emphasis added)

It is clear that § 1395dd(d)(2) creates a private cause of action in favor of individuals against hospitals for EMTALA violations. The statute, however, provides no such cause of action against physicians. When this court visited this issue in *Richardson v. Southwest, et al.*, it held that "Congress did not intend a private right of action for individuals pursuant to 42 U.S.C. § 1395dd against a physician or physician group." 794 F.Supp. at 201. Only one Circuit Court of Appeals had resolved this issue at that time. *See Gatewood v. Washington Healthcare Corporation*, 933 F.2d at 1040, n. 1 (The language in 42 U.S.C. § 1395dd(d)(2)(A) which provides " 'any individual who suffers personal harm ... may, in a civil action against the participating hospital, obtain [damages and equitable relief],' makes it "clear that there is no private cause of action against physicians under the Emergency Act.")

Since this court's ruling in *Richardson*, two other Circuit Courts of Appeals have answered the question of whether EMTALA creates a private right of action against physicians in the negative. *See Baber v. Hospital Corp. of America*, 977 F.2d at 877 (the Fourth Circuit Court of Appeals held that "the statute's legislative history demonstrates Congress intended to limit the patients' right to recover damages for violations of EMTALA to suits against hospitals."); *Delaney v. Cade*, 986 F.2d 387, 393 (10th Cir.1993) (The Tenth Circuit Court of Appeals stated that EMTALA creates "a civil remedy against hospitals but not against doctors.").

This court is persuaded that there is no reason for it to vacillate from its holding in *Richardson* or to quarrel with the holdings reached by other courts. Consequently, this court adheres to its earlier holding in *Richardson* that EMTALA does not create a private cause of action against physicians. Therefore, defendant Dr. Janes is entitled to summary judgment on plaintiff's claims against him.

## C. Whether EMTALA Was Violated By The Hospital

Although plaintiff cannot state a private cause of action against Dr. Janes under EMTALA, nothing in this law prohibits plaintiff from asserting a private cause of action for EMTALA violations against Southwest, the

remaining defendant in this action. 42 U.S.C. § 1395dd(d)(2). *See also Gatewood,* 933 F.2d at 1040; *Baber,* 977 F.2d at 877; and *Delaney,* 986 F.2d at 393.

### 1. *Screening*

■ In the instant case, plaintiffs question the "appropriateness and accuracy" of Dr. Janes' examination of Smith ". . . with regard to the standard of care." More specifically, plaintiffs contend that Dr. Janes was negligent in his examination of Smith at Southwest. Improper examination, says plaintiff, is actionable under state law of medical malpractice and under EMTALA. Defendants disagree with plaintiff and argue that a hospital's examination, albeit an improper examination, is not actionable under EMTALA. Defendants rely on *Baber* and *Gatewood.*

Because Southwest executed a Medicare provider agreement pursuant to 42 U.S.C. § 1395cc, it was obligated to treat Smith in accordance with EMTALA, as set forth in 42 U.S.C. § 1395dd(a), which provides:

> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

Section 42 § 1395dd(e)(1)(A) defines "an emergency medical condition" as:

> (A) A medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in:
>
> (i)    placing the health of the individual in serious jeopardy;
>
> (ii)   serious impairment to bodily functions;  or

> (iii)  serious dysfunction of any bodily organ or part.

This question of what constitutes an appropriate medical screening examination is an issue of first impression for this court. Other courts, however, have addressed this question and have held that "EMTALA only requires hospitals to apply their standard screening procedure for identification of an emergency medical condition uniformly to all patients." *See Baber,* 977 F.2d at 878. In *Baber,* the Court stated that "[t]he critical element of an EMTALA cause of action is not the adequacy of the screening examination but whether the screening examination that was performed deviated from the hospital's evaluation procedures that would have been performed on any patient in a similar condition." 977 F.2d at 881. The Court in *Gatewood* opined similarly, "[i]n our view, then, a hospital fulfills the 'appropriate medical screening' requirement when it conforms in its treatment of a particular patient to its standard screening procedures." 933 F.2d at 1041.

Plaintiff here concedes that she cannot dispute Southwest's assertion that the screening examination Dr. Janes performed on Smith was in accordance with Southwest's standard screening procedure used to detect emergency medical conditions. In his deposition, Dr. Janes testified that he examined Smith in the same manner in which he would have examined any other patient in a condition similar to Smith's. Dr. Janes testified that he ordered blood work on Smith; examined Smith's oropharynx and nasal passages; listened to Smith's chest and checked his circulation, blood pressure and heart rate; and gave Smith some medication to ease his pain.

Here, it is clear that Dr. Janes performed a screening examination to determine whether Smith had an emergency medical condition as mandated by 42 U.S.C. § 1395dd(a). In fact, Dr. Janes found that Smith had an emergency medical condition—first and second degree burns. Consequently, this court finds on the undisputed evidence that Dr. Janes performed an examination to determine whether Smith had an emergency medical condition and there is no evidence that his examination deviated from Southwest's eval-

uation procedures that would have been performed on any other patient in a similar condition.

Whether Dr. Janes may have failed to correctly ascertain Smith's respiratory condition is not the focus on the question of proper screening. EMTALA does not guarantee that all diagnoses made during a screening will be correct. EMTALA merely requires hospitals to conduct an examination to determine whether a patient has an emergency medical condition. "The avowed purpose of EMTALA was not to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care, but instead to provide an 'adequate first response to a medical crisis' for all patients and 'send a clear signal to the hospital community ... that all Americans, regardless of wealth or status, should know that a hospital will provide what services it can when they are truly in physical distress.'" *Baber*, 977 F.2d at 880, quoting 131 Cong.Rec. s13904 (Oct. 23, 1985) (statement of Sen. Durenberger).

### 2. *Treatment*

■ Plaintiff next contends that Southwest violated EMTALA because after discovering that Smith had an emergency medical condition, Southwest failed to stabilize Smith before transporting him to the burn center. Plaintiff relies on *Delaney v. Cade*, 986 F.2d 387, 393 (10th Cir.1993). Southwest, however, contends that Dr. Janes believed that Smith was stabilized and was not aware of any problems relative to Smith's respiratory condition. As such, says Southwest, it cannot incur liability under EMTALA for failing to stabilize a condition of which it was unaware. Defendants rely on *Baber, Cleland v. Bronson Health Care Corp.*, 917 F.2d 266 (6th Cir.1990), and *Thornton v. Southwest Detroit Hosp.*, 895 F.2d 1131 (6th Cir.1990).

With respect to an emergency medical condition described in § 1395dd(1)(A), stabilized means that "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility ...". 42 U.S.C. § 1395dd(e).

In *Delaney,* the plaintiff was injured in an automobile accident. The plaintiff was transported to St. Joseph Hospital ("St. Joseph") where a physician sutured lacerations in her knees but did not perform a physical examination or order x-rays or other treatment. Officials at St. Joseph's transferred the plaintiff to Central Kansas Medical Center ("Central Kansas"). When plaintiff left St. Joseph, she had feelings and movement in her legs; however, she had lost that feeling by the time she arrived at Central Kansas. Officials at Central Kansas transferred the plaintiff to the University of Kansas Medical Center, where an aortagram was performed on plaintiff. It revealed that Delaney had a transected aorta which had clotted. Delaney underwent surgery to repair the transected aorta, but she was left with permanent paralysis.

Delaney brought suit against Dr. Cade, a physician at St. Joseph, St. Joseph, and Central Kansas Medical Center. Delaney asserted state negligence claims, as well as claims under 42 U.S.C. § 1395dd. The district court dismissed Delaney's EMTALA claims. The Tenth Circuit reversed and held that although EMTALA does not provide a private cause of action against physicians, a hospital can violate EMTALA if it fails to stabilize a patient's emergency medical condition before transferring or releasing the patient. *Delaney,* 986 F.2d at 391–92.

In *Delaney,* the plaintiff argued that the medical evidence concerning the loss of feeling in her legs demonstrated that her condition materially deteriorated during her transfer. Impressed by this argument, the *Delaney* Court found that genuine issues of material fact were present in that case and that summary judgment in favor of the defendants was precluded. *Delaney,* 986 F.2d at 393. The Court stated:

> We believe the state of the evidence puts into question whether at the time of her transport "no material deterioration of [her] condition [was] likely, within reasonable medical probability." 42 U.S.C. § 1395dd(e)(3)(B). Thus, that question is not conceded and raises a material issue of fact. While defendants contend there is no evidence Ms. Delaney's thrombosis was a consequence of her transport, they do not address whether the loss of feeling and function in her legs was the type of "dete-

rioration" the Act seeks to prevent. Nor do they discuss the presence of evidence of whether the loss of feeling and motion would have been foreseeable within a reasonable medical probability. In the absence of clear answers to those questions, we believe the issue whether Ms. Delaney was stabilized has an evidentiary component we cannot resolve. Therefore, we conclude the district court's summary judgment on this claim was premature.

Defendants say the outcome of this case should be governed by the holdings in *Baber, Cleland* and *Thornton.* The defendants' reliance on those cases is misplaced. In *Baber,* the Court explicitly pointed out that it need not reach the issue of stabilization because the plaintiff in that case failed to demonstrate that the hospital in question knew that she had an emergency medical condition. 977 F.2d at 884. *See also Gatewood,* 933 F.2d at 1041 (stating that the court need not "address the scope of the stabilization and transfer provisions of the Emergency Act, subsections 1395dd(b) and (c). Those provisions are triggered only after a hospital 'determines that [an] individual has an emergency medical condition' "). *Cleland* poses a similar circumstance. After the individual was screened, the doctor determined that the individual did not have an emergency medical condition. 917 F.2d at 271. Therefore, the Court held that "[i]f the emergency nature of the condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition." *Id.* In the instant case, it is not disputed that Southwest detected that Smith had an emergency medical condition occasioned by first and second degree burns.

In *Thornton,* the Sixth Circuit Court of Appeals found that the district court had correctly determined that the individual's emergency medical condition had been stabilized upon her release from the hospital. 895 F.2d at 1134–35. In *Thornton,* the plaintiff was admitted to the hospital and spent 10 days in the hospital's intensive care unit and 11 additional days in regular in-patient care. Before releasing Thornton, a physician attempted to have her admitted into the Detroit Rehabilitation Institute for post-stroke rehabilitation therapy. *Id.* at 1132. The institute refused to accept Thornton because her health insurance would not cover the cost. *Id.* Thereafter, she was discharged from the hospital to her sister's home for basic home nursing care. After Thornton's release, her condition deteriorated, and she was finally admitted to the institute nearly three months later. *Id.* Subsequently, Thornton brought suit against the hospital for releasing her before she was stabilized. The district court found that there was no genuine issue of material fact as to whether "—after a three week stay in the Hospital—Elease Thornton's condition had stabilized sufficiently for release." *Id.* at 1134. The Sixth Circuit Court of Appeals affirmed. *Id.* at 1135. *Thornton,* however, is markedly distinguishable from the instant case. There, based upon all of the relevant facts, the Court found that "no genuine issue of material fact existed as to whether her condition had stabilized at the time of her release." *Id.* at 1135.

Here, the facts are not so clear. Smith had an emergency medical condition—first and second degree burns. Once Dr. Janes detected an emergency medical condition, he had a duty to stabilize that condition within Southwest's facility or to transfer Smith. Dr. Janes contends that Smith was stable. The evidence shows that during Smith's transfer he developed respiratory difficulty and had to be taken to the Vicksburg Regional Hospital, where an endotracheal tube was placed in this throat to prevent potential respiratory difficulty. Although Dr. Janes' notation in Smith's medical chart indicated that his condition was "good" before he left Southwest, upon Smith's arrival at the burn center, Dr. Robert Bowman found that Smith was in critical condition and under resuscitation. Plaintiff has presented the affidavit of Dr. Joseph S. Litner, who opines that a major burn patient has "a high probability of developing a rapid onset of a compromised airway." In *Burditt,* the Fifth Circuit stated that a physician could not have stabilized Rivera [a patient] unless he provided treatment that medical experts agree would prevent the threatening and severe consequences of Rivera's hypertension while she was in transit. *Burditt,* 934 F.2d at 1369.

The medical experts here disagree. Accordingly, this court finds that there exists a genuine issue of material fact as to whether there was a reasonable medical probability that Smith's condition would likely materially deteriorate during the transfer. Because this court finds that there are genuine issues of fact here, it is precluded from granting summary judgment on this claim.

### 3. *Transfer*

█ Plaintiff contends that Southwest's transfer of Smith by mobile ambulance, rather than by air ambulance, was inappropriate because Smith was not stabilized and the ambulance did not contain necessary and medically appropriate life support measures. Southwest argues that EMTALA transfer provisions do not apply here because Dr. Janes believed that Smith was stable at the time of the transfer inasmuch as Dr. Janes was not aware that Smith was having respiratory problems. However, this court has held that the issue of whether Smith was stabilized as defined by the statute is a question of fact to be decided by the factfinders.

Alternatively, says Southwest, even if Smith was not stabilized when he was transferred, Southwest's transfer of Smith comported with § 1395dd(c)(2)(D). Plaintiff contends otherwise.

Title 42 U.S.C. § 1395dd(c)(2)(C) (Supp. IV 1987), amended by 42 U.S.C. § 1395dd(c)(2)(D) (West Supp.1991) requires, *inter alia,* that "the transfer [be] effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer; ..."

In *Burditt,* the Fifth Circuit fleshed out this requirement, holding that this provision mandates the use of "personnel and transportation equipment that a reasonable physician would consider appropriate to safely transport the patient in question." *See Burditt,* 934 F.2d at 1372; that Congress inserted "as required" in the provision "to limit the scope of the requirement of qualified personnel and equipment to those conditions known to the transferring physician;" *id.;* and that "transportation equipment" includes "all

physical objects reasonably medically necessary for safe patient transfer." *Id.* at 1373.

In an affidavit in response to the defendants' motion for summary judgment, plaintiff's expert, Dr. Joseph Litner, stated:

In my opinion, Dr. Janes and Southwest Mississippi Regional Medical Center failed to provide appropriate transfer equipment and qualified personnel for the transfer of Smith from Southwest Mississippi Regional Medical Center to the Burn Center in Greenville, Mississippi. The most appropriate transfer equipment for transfer of a major burn patient such as Mr. Smith is by air ambulance, especially when one considers the distance from McComb, Mississippi, to Greenville, Mississippi. Dr. Janes testified in his deposition that he did not even consider air transport for Mr. Smith. It is my opinion that had Dr. Janes contacted air ambulance services at the time of his initial evaluation of Mr. Smith, that more than likely, air ambulance service would have been available for transporting Mr. Smith by the time Dr. Janes completed his evaluation and preparation of him for transfer. Air ambulance services were available to Dr. Janes at Southwest Mississippi Regional Medical Center on October 20, 1991, through Acadian Air Ambulance Services. On December 20, 1991, a major burn patient was transferred by Acadian Air Ambulance Services from the McComb, Pike County, airport to the Burn Center in Greenville, Mississippi. When air ambulance services are available for transporting a major burn patient such as Mr. Smith, from a regional hospital to a major burn center, appropriate transfer dictates the use of air ambulance.

Dr. Litner's affidavit thus raises a genuine issue of material fact as to whether Smith's transfer was effectuated "through qualified personnel and transportation equipment." The question to be resolved by the jury is whether a reasonable physician would have considered a mobile ambulance appropriate to safely transport Smith. *See Burditt,* 934 F.2d at 1372.

## V. CONCLUSION

This court finds that no genuine issues of material fact exist which would preclude summary judgment on plaintiff's claims against Dr. Janes, and on plaintiff's claim against the hospital for improper examination. This court, however, finds that there exist genuine issues of material fact as to whether Smith was stabilized when he was transferred from Southwest to the burn center and whether Smith's transfer was effectuated through the use of "qualified equipment."

**IT IS, THEREFORE, ORDERED** that plaintiff's EMTALA claims against Dr. Janes are hereby dismissed, as well as plaintiff's EMTALA claims for improper examination against Southwest.

SO ORDERED AND ADJUDGED.