*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0137p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JOHNELLA RICHMOND MOSES, Personal
Representative of the Estate of MARIE MOSES
IRONS, deceased,

         *Plaintiff-Appellant,*

     *v.*

PROVIDENCE HOSPITAL AND MEDICAL
CENTERS, INC. and PAUL LESSEM,

         *Defendants-Appellees,*

CHRISTOPHER WALTER HOWARD,

         *Third-Party Defendant.*

No. 07-2111

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-74889—Anna Diggs Taylor, District Judge.

Argued: December 5, 2008

Decided and Filed: April 6, 2009

Before: CLAY and GIBBONS, Circuit Judges; STAMP, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Mark Granzotto, MARK GRANZOTTO, P.C., Royal Oak, Michigan, for
Appellant. Susan Healy Zitterman, KITCH, DRUTCHAS, WAGNER, DeNARDIS,
VALITUTTI & SHERBROOK, Detroit, Michigan, for Appellee. **ON BRIEF:** Mark
Granzotto, MARK GRANZOTTO, P.C., Royal Oak, Michigan, for Appellant. Susan
Healy Zitterman, KITCH, DRUTCHAS, WAGNER, DeNARDIS, VALITUTTI &
SHERBROOK, Detroit, Michigan, for Appellee.

---

[*]The Honorable Frederick P. Stamp, Jr., Senior United States District Judge for the Northern
District of West Virginia, sitting by designation.

1

_____

## OPINION

_____

CLAY, Circuit Judge.  Plaintiff Johnella Richmond Moses, as representative of the estate of Marie Moses-Irons ("Moses-Irons"), brings claims against Defendants Providence Hospital and Medical Centers, Inc. (the "hospital") and Paul Lessem ("Dr. Lessem") pursuant to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, and common law negligence.  Plaintiff alleges that Defendants violated EMTALA by releasing Moses-Irons' husband from the hospital ten days before he murdered Moses-Irons.  Plaintiff appeals the district court's decision to grant Defendants' motion for summary judgment and dismiss Plaintiff's claims.  For the following reasons, we **REVERSE** the district court and **REMAND** for further proceedings with respect to the hospital, but **AFFIRM** with respect to Dr. Lessem.

## BACKGROUND

### I.       Factual Background

On December 13, 2002, Moses-Irons took Howard to the emergency room of Providence Hospital in Southfield, Michigan because Howard was exhibiting signs of illness.  Howard's physical symptoms included severe headaches, muscle soreness, high blood pressure and vomiting.  Howard was also experiencing slurred speech, disorientation, hallucinations and delusions.  Moses-Irons reported these symptoms to the emergency room staff, and also informed them that Howard had "demonstrated threatening behavior, which made her fearful for her safety."  (Joint Appendix ("J.A.") at 31-32.)  The emergency room physicians decided to admit Howard to conduct more tests.  Among the physicians who evaluated Howard during his stay at the hospital were Mark Silverman ("Dr. Silverman"), a neurologist; Dr. Lessem, a psychiatrist; and Djeneba Mitchell ("Dr. Mitchell"), an internist.

Dr. Silverman examined Howard on December 14, 2002.  Dr. Silverman determined that Howard "was acting inappropriately" and "appeared to be somewhat

obtunded," but had "no overt outward signs of trauma." (J.A. at 153.) In addition to informing Dr. Silverman of Howard's symptoms, Moses-Irons also told him that Howard had told her that he "had bought caskets." (J.A. at 150.) Dr. Silverman learned from Moses-Irons that Howard had recently tried to board a plane with a hunting knife. Dr. Silverman ordered a magnetic resonance imaging exam, though it is unclear from the record whether the exam ever took place. Dr. Silverman also "felt that a psychiatric evaluation would be warranted," as well as a "lumbar puncture." (J.A. at 154, 158.) His notes from the evaluation indicate his belief that "an acute psychotic episode [must] be ruled out." (J.A. at 153, 158.)

Dr. Lessem examined Howard several times during Howard's stay at the hospital. On December 17, 2002, Dr. Lessem determined that Howard was not "medically stable from a psychiatric standpoint," and decided that Howard should be transferred to the hospital's psychiatric unit called "4 [E]ast" to "reassess him." (J.A. at 165.) According to Dr. Lessem, 4 East is intended for patients "who are expected to be hospitalized and stabilized and who are acutely mentally ill." (J.A. at 165.) Dr. Lessem felt Howard could be more closely observed at 4 East, and planned to conduct "reality testing" of Howard there to determine the extent of Howard's delusions. (J.A. at 168.) Dr. Lessem's order notes from December 17, 2002 state, "will accept [patient] to 4 [E]ast if [patient]'s insurance will accept criteria" and "please observe carefully for any indications of suicidal ideation or behavior." (J.A. at 172.) Under the heading "orders for 4 [E]ast," Dr. Lessem wrote, "suicide precautions." (J.A. at 173.) The notes also indicate that Dr. Lessem believed Howard had an "atypical psychosis" and "depression." (J.A. at 172.)

Howard was never transferred to the psychiatric unit, and instead was informed on December 18, 2002 that he would be released. A hospital clinical progress report signed by Dr. Mitchell that day stated that "[patient] declines 4 [E]ast, wants to go home. His affect is brighter. No physical symptoms now. [Patient] wishes to go home, wife fears him. Denies any suicidality." (J.A. at 219.) Howard stated in a deposition that he never declined going to 4 East. In Howard's discharge summary form filled out on

December 18, 2002, the hospital's "final diagnosis" of Howard, written by a resident, was that he had a "migraine headache" and an "atypical psychosis [with] delusional disorder." (J.A. at 178.) A report dated December 19, 2002, signed by Dr. Mitchell, indicated that Howard would be "[discharged] home today . . . cannot stay as he is medically stable and now does not need 4E." (J.A. at 89.) Howard was released on December 19, 2002, and on December 29, 2002, Howard murdered Moses-Irons.

On December 14, 2004, Plaintiff filed a federal suit against the hospital and Dr. Lessem, alleging a violation of EMTALA and various negligence claims. On January 5, 2005, Defendants filed a motion to dismiss the complaint, on the ground that EMTALA only provides a right of action for a plaintiff who sought treatment as a hospital's patient. On February 28, 2005, the district court denied Defendants' motion from the bench, stating, *inter alia*, that "the plain language of the statute does not preclude a lawsuit by the injured third party." (J.A. at 181.) Plaintiff filed an amended complaint on September 29, 2005. On January 6, 2006, Defendants filed a third-party complaint against Howard.

## II.     Motion for Summary Judgment

On May 14, 2007, Defendants filed a motion for summary judgment. In their brief supporting their motion, Defendants raised two arguments: (1) that Plaintiff does not have standing to sue, because only the individual patient who seeks treatment at the hospital has standing under EMTALA; and (2) that EMTALA imposes no further obligation on a hospital once the hospital has admitted a person as an inpatient. Defendants' motion did not refer to any factual record, and they attached only the EMTALA statute and applicable regulations to their motion.

At oral argument before the district court on July 30, 2007, Defendants argued for the first time that the hospital physicians, after conducting the proper screening, did not diagnose Howard as having an emergency medical condition. At oral argument, Defendants referred in general terms to the testimony and documentation of the hospital physicians who attended to Howard to support this third argument, without producing

the evidence they were referencing. Neither the December 18, 2002 progress report stating that Howard had no physical symptoms and denied "suicidality," nor the December 19, 2002 progress report in which Dr. Mitchell stated that Howard was stable, was attached to Defendants' summary judgment motion; however, both documents were attached to Defendants' response to a separate motion to compel discovery filed on April 13, 2007. During oral argument, Defendants also referred to letters from Howard's insurance company indicating that the insurance company did not deny coverage for Howard's treatment until January 2003, after Howard had been released; those letters were not submitted with Defendants' motion papers, nor are they included in the record on appeal.

Following oral argument, the district court granted Defendants' summary judgment motion from the bench, dismissing the EMTALA claim and choosing not to exercise jurisdiction over the negligence claims. In dismissing the EMTALA claim, the district court stated that summary judgment must be granted "regardless of the standing issue." (J.A. at 216.) The entirety of the district court's reasoning for granting summary judgment was as follows:

> First of all, the EMTALA statute was not designed or intended to establish guidelines for patient care or to provide a suit for medical negligence or malpractice. Under the clear and unambiguous language of the statute, the Plaintiff's claim must be dismissed. The hospital admitted Howard and did not turn him away, as was required by the Sixth Circuit in *Cleland [v. Bronson Health Care Group Inc.*, 917 F.2d 266 (6th Cir. 1990)]. The patient was undisputedly completely screened, as the statute requires, even if on the basis of a wrong diagnosis; and he was thereafter admitted to the Defendant hospital, and no emergency medical condition was recognized on the screening. So, for all of those reasons . . . the motion of the Defendants must be granted.

(J.A. at 216.) Plaintiff timely appealed.

On appeal, Plaintiff asserts that she did not receive fair notice that during oral argument Defendants would rely on evidence that the doctors believed Howard did not have an emergency medical condition. Had Plaintiff received proper notice, she asserts, she would have filed with her pleadings an expert report by Harold J. Bursztajn ("Dr.

Bursztajn"), a professor of psychiatry at Harvard Medical School, who concluded that Howard did have an emergency medical condition upon arriving at the hospital, and had not stabilized by the time he was discharged. Dr. Bursztajn based his conclusion on Dr. Lessem's own notes from December 17, 2002, in which Dr. Lessem had diagnosed Howard as having an atypical psychosis and possibly suicidal behavior. Dr. Bursztajn concluded that "the symptoms and mental state described by Dr. Lessem could not be resolved in one to two days, yet the decision to discharge Mr. Howard was made one day later." (J.A. at 68-69.) Dr. Bursztajn's expert report was served and filed on October 25, 2006, as part of Plaintiff's reply materials in connection with an earlier motion to compel a mental examination of Howard. Plaintiff includes this expert report in the record on appeal.

## DISCUSSION

### I.    Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1176 (6th Cir. 1996). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As the moving party, Defendants bear the burden of showing the absence of a genuine issue of material fact as to at least one essential element of Plaintiff's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Plaintiff, as the non-moving party, must then present sufficient evidence from which a jury could reasonably find for her. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). This Court must then determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. In making this determination, this Court must draw all reasonable inferences in favor of Plaintiff. *See Nat'l Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997).

## II.     Overview of EMTALA

For all hospitals that participate in Medicare and have an "emergency department," EMTALA sets forth two requirements. First, for any individual who "comes to the emergency department" and requests treatment, the hospital must "provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a). Second, if "the hospital determines that the individual has an emergency medical condition, the hospital must provide either (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility[.]" § 1395dd(b). Thus, for any individual who seeks treatment in a hospital, the hospital must determine whether an "emergency medical condition" exists, and if the hospital believes such a condition exists, it must provide treatment to "stabilize" the patient. *Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131, 1134 (6th Cir. 1990).

The statute defines "emergency medical condition" as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in . . . [*inter alia*] placing the health of the individual . . . in serious jeopardy[.]" § 1395dd(e)(1)(A)(i). "To stabilize" a patient with such a condition means "to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" § 1395dd(e)(3)(A). "Transfer" is defined in the statute to include moving the patient to an outside facility or discharging him. § 1395dd(e)(4).

Including the argument made for the first time during oral argument before the district court, Defendants appear to have moved for summary judgment on three grounds: (1) Plaintiff lacks standing to sue under EMTALA; (2) EMTALA's requirements were satisfied when the hospital admitted Howard on December 13, 2002; and (3) because Howard was indisputably screened and diagnosed as not having an emergency medical condition, EMTALA did not apply. Because any one of these

grounds would have been sufficient for the district court to grant summary judgment to the Defendants, we address each of them in turn.

## III.   Standing

In deciding Defendants' motion for summary judgment, the district court did not reach the issue of whether, as a non-patient, Plaintiff has standing under EMTALA to bring a claim, although it did deny Defendants' previous motion to dismiss on that ground.   Because Defendants prevailed below, this Court may consider affirming summary judgment based on Plaintiff's lack of standing.  *See Dandridge v. Williams*, 397 U.S. 471, 475 n. 6 (1970) ("The prevailing party may, of course, assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court.").

Pursuant to EMTALA's civil enforcement provision, "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate."   42 U.S.C. § 1395dd(d)(2)(A).  Neither this subsection, nor any other part of EMTALA, includes any mention of non-patients.  Moreover, this Court is not aware of any federal appellate court that has addressed whether non-patients who allege harm as a result of a hospital's violation of EMTALA have standing to sue.  Defendants cite two district court decisions from other circuits, which hold that the relatives of a patient who suffers harm cannot sue a hospital in their individual capacities for harm suffered by the patient.  *See Zeigler v. Elmore Health Care Auth.*, 56 F. Supp. 2d 1324 (M.D.Ala. 1999); *Sastre v. Hosp. Doctors Center, Inc.*, 93 F. Supp. 2d 105 (D. Puerto Rico 2000).  However, because the estate of the individual who suffered an actual personal injury brings the suit in this case, claiming personal harm as a direct result of the hospital's decision, those decisions are inapposite and of limited persuasive value.

"In the absence of an indication to the contrary, words in a statute are assumed to bear their 'ordinary, contemporary, common meaning.'"  *Walters v. Metro. Educ.*

*Enters., Inc.*, 519 U.S. 202, 207 (1997) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Ass'ns Ltd. P'ship*, 507 U.S. 380, 388 (1993)). The plain language of the civil enforcement provision of EMTALA contains very broad language regarding who may bring a claim: "*any* individual who suffers personal harm as a direct result" of a hospital's EMTALA violation may sue. § 1395dd(d)(2)(A) (emphasis added). This language would seem to include Plaintiff, whose suit alleges that Moses-Irons' death was the direct result of the hospital's decision to release her husband before his psychiatric emergency medical condition had stabilized.

In arguing that only harmed *patients* may sue, Defendants contend that the phrase "any individual" in § 1395dd(d)(2)(A) must be read in the context of other parts of the statute. Because the medical screening requirement in § 1395dd(a) refers to an "individual" who "comes to the emergency department" and the stabilization requirement in § 1395dd(b) refers to an "individual" who "comes to a hospital," the term "any individual" in the civil enforcement provision should also be so limited. There are two problems with reading the statute this way. First, the medical screening requirement and the stabilization requirement do not refer to the same "individual"–the medical screening requirement of § 1395dd(a) only applies to individuals who come to an "emergency department," presumably a smaller subset of individuals than those "who come[] to a hospital" and are the subject of § 1395dd(b). This differing language indicates that Congress did not intend EMTALA's entire statutory scheme to apply to the same "individual" in every part of the statute. Second, the fact that the statute expressly limits the individual to whom the hospital owes its EMTALA obligations in §§ 1395dd(a) and (b) further indicates that the breadth of the civil enforcement provision was no accident. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also Gozlon-Peretz v. United States*, 498 U.S. 395, 404-05 (1991). If Congress had intended to limit the right of action to any individual who "comes to a hospital" as a patient, it could have done so, just as it did in other parts of the statute. *See United States v. Parrett*, 530 F.3d 422 (6th Cir.

2008) ("Plain meaning is examined by looking at the language and design of the statute as a whole.").

Defendants also argue that EMTALA's legislative history supports their narrower construct of the civil enforcement provision. The original bill, reported out of the House Ways and Means Committee, extended the private right of action to "any person or entity that is adversely affected directly by a participating hospital's violation[.]" H.R. Rep. No. 99-241, pt. 1, at 132, *reprinted in* 1986 U.S.C.C.A.N. 579, 605. The bill was referred to the House Judiciary Committee, which amended the civil enforcement provision to a version essentially the same as its current form, changing "adversely affected" to "suffers harm as a direct result," and changing "person or entity" to "individual." H.R. Rep. No. 99-241, pt. 3 at 6, *reprinted in* 1986 U.S.C.C.A.N. 726, 728. The report from the House Judiciary Committee states that as a result of its amendment to the bill, the only individual who can sue is the "individual patient who suffers harm as a direct result of hospital's failure to appropriately screen, stabilize, or properly transfer that patient." *Id.*

However, where a House committee's explanation of the meaning of a statute seems to differ from the statute's actual wording, this Court should not rely on that committee's statement as the exclusive explanation for the meaning of the statute. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("[J]udicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members–or, worse yet, unelected staffers and lobbyists–both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text."). In this case, the parties have not pointed to any further legislative history, other than the one statement from the report of the House Judiciary Committee, as proof of Congress' intent with respect to the scope of the civil enforcement provision. We have also failed to uncover any substantive debate over the provision on either the House or Senate floors. As this Court has previously noted in examining EMTALA's legislative history, "[t]he only clear guidance from the legislative

history is that Congress intended to prevent hospitals from dumping patients who suffered from an emergency medical condition because they lacked insurance to pay the medical bills." *Thornton*, 895 F.2d at 1134.

Regardless of the paucity of the legislative record on the standing issue, we believe that the civil enforcement provision, read in the context of the statute as a whole, plainly does not limit its reach to the patients treated at the hospital. We therefore need not–and ought not–consult an isolated statement in a committee report. *See United States v. Choice*, 201 F.3d 837, 840 (6th Cir. 2000) ("The language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear.").

We recognize that our interpretation of the civil enforcement provision may have consequences for hospitals that Congress may or may not have considered or intended. However, our duty is only to read the statute as it is written, as we have in our past analysis of EMTALA. In *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 269 (6th Cir. 1990), the defendants argued that because Congress sought to protect the rights of the indigent and uninsured in enacting EMTALA, only the indigent or uninsured should be allowed to sue under the act. This Court expressly rejected this narrow reading of the civil enforcement provision, stating that "[u]nfortunately for this theory, Congress wrote a statute that plainly has no such limitation on its coverage." *Id*. Similarly here, EMTALA's plain language belies Defendants' argument that Congress intended to deny non-patients the right to sue in every circumstance.

Thus, for the foregoing reasons, we conclude that Plaintiff has standing to sue pursuant to EMTALA.

## IV.     The Hospital's Obligations Upon Finding an Emergency Medical Condition

Defendants argue that, if Howard did have an emergency medical condition when he came to the hospital, the hospital's decision to admit him for six days and perform further testing satisfied its obligations under EMTALA to treat so as to stabilize the patient. We disagree.

Contrary to Defendants' interpretation, EMTALA imposes an obligation on a hospital beyond simply admitting a patient with an emergency medical condition to an inpatient care unit. The statute requires "such treatment as may be required to stabilize the medical condition," § 1395dd(b), and forbids the patient's release unless his condition has "been stabilized," § 1395dd(c)(1). A patient with an emergency medical condition is "stabilized" when "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during" the patient's release from the hospital. § 1395dd(e)(3)(B). Thus, EMTALA requires a hospital to treat a patient with an emergency condition in such a way that, upon the patient's release, no further deterioration of the condition is likely. In the case of most emergency conditions, it is unreasonable to believe that such treatment could be provided by admitting the patient and then discharging him.

In *Thornton*, this Court examined whether EMTALA requires hospitals to do more for patients with emergency medical conditions than just admit them. 895 F.2d at 1134. In that case, it was undisputed that the patient initially had an emergency medical condition when the defendant hospital admitted her to the emergency room for a stroke; the issue was whether the hospital violated EMTALA by releasing her twenty-one days later from the hospital's regular inpatient care unit. *Id.* Although ultimately affirming summary judgment because the patient's condition had stabilized prior to her release, this Court first rejected the hospital's argument that once it transferred the patient from the emergency room to inpatient care, its obligations under EMTALA were fulfilled:

> Congress sought to insure that patients with medical emergencies would receive emergency care. Although emergency care often occurs, and almost invariably begins, in an emergency room, emergency care does not always stop when a patient is wheeled from the emergency room into the main hospital. Hospitals may not circumvent the requirements of the Act merely by admitting an emergency room patient to the hospital, then immediately discharging that patient. *Emergency care must be given until the patient's emergency medical condition is stabilized.*

*Id.* at 1135 (emphasis added). Thus, the statute requires more than the admission and further testing of a patient; it requires that actual care, or treatment, be provided as well.

Accordingly, Defendants could not satisfy their EMTALA obligations merely by screening Howard and admitting him to conduct further testing.

To support their narrower reading of EMTALA's requirements, Defendants point to a rule promulgated by the Centers for Medicare and Medicaid Services ("CMS"), the agency responsible for implementing EMTALA, that effectively ends a hospital's EMTALA obligations upon admitting an individual as an inpatient. 42 C.F.R. § 489.24(d)(2)(i). According to the CMS regulation, "[i]f a hospital has screened an individual under paragraph (a) of this section and found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section with respect to that individual." *Id.*

Although "[a]n agency's construction of a statutory scheme that it is entrusted to administer is entitled to a degree of deference. . . . we must . . . 'reject administrative constructions which are contrary to clear congressional intent.'" *Gallagher v. Croghan Colonial Bank*, 89 F.3d 275, 277-78 (6th Cir. 1996) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)). The CMS rule appears contrary to EMTALA's plain language, which requires a hospital to "provide . . . for such further medical examination *and such treatment* as may be required to stabilize the medical condition[.]" § 1395dd(b)(1)(A) (emphasis added). Although "treatment" is undefined in the statute, it is nevertheless unambiguous, because it is unreasonable to believe that "treatment as may be required to stabilize" could mean simply admitting the patient and nothing further. Moreover, the statute requires the patient to be "stabilized" upon release; "[i]f an individual at a hospital has an emergency medical condition which has not been stabilized . . . the hospital may not transfer the individual unless" the patient requests a transfer in writing or a physician or qualified medical person certifies that the risks of further treatment outweigh the benefits. § 1395dd(c)(1)(A). Therefore, a hospital may not release a patient with an emergency medical condition *without first determining that the patient has actually stabilized*, even if the hospital properly admitted the patient. Such a requirement would be unnecessary if a hospital only needed

to admit the patient in order to satisfy EMTALA. Because the CMS rule is contrary to the plain language of the statute, this Court does not afford it *Chevron* deference. *See Gallagher*, 89 F.3d at 278.

Even if the CMS regulation could somehow be deemed consistent with the statute, its promulgation in 2003, after Howard's stay in the hospital ended, would preclude this Court from applying it to this case. "As a general rule, a court 'must apply the law in effect at the time it renders its decision. Because '[r]etroactivity is not favored in the law,' however, courts should not construe 'congressional enactments and administrative rules . . . to have retroactive effect unless their language requires this result.'" *BellSouth Telecomms., Inc. v. Se. Tel., Inc.*, 462 F.3d 650, 657 (6th Cir. 2006) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 263-64 (1994)). To determine whether a regulation should be applied to events arising prior to the regulation's enactment, courts first inquire whether the regulation expressly reaches retroactively; if the regulation is silent on the issue, then the court asks "'whether applying the statute to the person objecting would have a retroactive consequence in the disfavored sense of affecting substantive rights, liabilities, or duties on the basis of conduct arising before its enactment.'" *Id.* at 658 (quoting *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (6th Cir. 2006)). If such rights are affected, then courts must apply a presumption against retroactivity. *Id.* Here, the CMS regulation is silent on retroactivity, and because the regulation would affect the extent of the care that Howard could have expected upon admission as an inpatient, the regulation "attaches legal consequences to events completed before its enactment," *Landgraf*, 511 U.S. at 270. The CMS regulation therefore does not apply to this case, regardless of whether its interpretation of the statute is reasonable.

In short, the hospital was required under EMTALA not just to admit Howard into the inpatient care unit, but to *treat* him in order to stabilize him. Accordingly, Defendants are not entitled to summary judgment simply on the ground that the hospital admitted Howard as an inpatient and subjected him to several days of testing.

## V.      Existence of an Emergency Medical Condition

The district court's reasoning in granting summary judgment was partially predicated on its finding that the hospital conducted an appropriate screening, and that "no emergency medical condition was recognized on the screening." (J.A. at 216.) We believe that whether Howard had an emergency medical condition that the hospital recognized upon screening him is an issue of fact that the court should have left for a jury to decide.

As an initial matter, "before summary judgment may be granted against a party, Fed. R. Civ. P. 56(c) mandates that the party opposing summary judgment be afforded notice and a reasonable opportunity to respond to all issues to be considered by the court." *Routman v. Automatic Data Processing, Inc.,* 873 F.2d 970, 971 (6th Cir. 1989). "Rule 56(c) requires at a minimum that an adverse party be extended at least ten days notice before summary judgment may be entered." *Id.* "Noncompliance with the time provision of the rule deprives the court of authority to grant summary judgment, unless . . . [*inter alia*] there has been no prejudice to the opposing party by the court's failure to comply with this provision of the rule." *Kistner v. Califano*, 579 F.2d 1004, 1006 (6th Cir. 1978) (citations omitted).

In this case, the district court granted summary judgment from the bench at the end of oral argument, and based its decision in part on the fact that the hospital never detected an emergency medical condition–a ground that Defendants had not raised prior to oral argument. Moreover, Defendants' briefs in support of their summary judgment motion did not include *any* supporting evidence whatsoever, as their written arguments were based purely on statutory interpretation; to the extent that the district court relied on any evidence at all with respect to this ground, such evidence came from exhibits Defendants attached to previous filings. Although there is no rule prohibiting the district court from considering previously submitted evidence–*see* Fed. R. Civ. P. 56(c) (allowing court to consider "the pleadings, the discovery and disclosure materials *on file*" in resolving a motion for summary judgment) (emphasis added)–it is still difficult to discern how Plaintiff could have received sufficient notice of this argument, or a

reasonable opportunity to oppose it with evidence, without being advised that this issue would determine the district court's ruling on the motion.

With respect to prejudice, Plaintiff argues that had she known Defendants would raise the absence of an emergency medical condition at oral argument, she would have included Dr. Bursztajn's expert report in her opposition to Defendants' motion. Defendants had notice of Dr. Bursztajn's report, because it was filed in connection with a previous motion to compel during discovery. We therefore will consider Dr. Bursztajn's report on appeal. In reviewing this report as well as the remainder of the evidence in the record, we find that issues of fact exist with respect to whether the hospital physicians actually believed Howard lacked an emergency medical condition.

An "emergency medical condition" is "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in . . . [*inter alia*] placing the health of the individual . . . in serious jeopardy[.]" § 1395dd(e)(1)(A)(i). The language in the statute does not appear to preclude classifying a psychiatric condition as an emergency medical condition, and "the health of the individual" could certainly include the individual's mental health. Moreover, we are not aware of any discussion of this issue in the legislative history. Without such guidance, we hold that a mental health emergency could qualify as an "emergency medical condition" under the plain language of the statute.

**A.    Howard's Condition Upon Arrival at the Hospital**

At the time he came to the hospital, Howard was experiencing slurred speech, disorientation, hallucinations and delusions, and was making threatening statements, including telling his wife that he had "bought caskets." (J.A. at 150.) Howard's condition included physical symptoms such as severe headaches, muscle soreness, high blood pressure and vomiting. Moreover, Dr. Bursztajn's report, based on a review of Howard's hospital records, concluded that Howard had an emergency medical condition upon arriving at the hospital. Thus, there is plenty of evidence in the record to create an issue of fact with respect to whether Howard's condition was a mental health emergency.

However, in order to trigger further EMTALA obligations, the hospital physicians must actually recognize that the patient has an emergency medical condition; if they do not believe an emergency medical condition exists because they wrongly diagnose the patient, EMTALA does not apply. *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 786 (6th Cir. 2003).[1] Yet while actual knowledge is required, "any hospital employee or agent that has knowledge of a patient's emergency medical condition might potentially subject the hospital to liability under EMTALA." *Id.* at 788.

Howard was admitted to the hospital so that the hospital physicians could conduct further tests, including an MRI, a lumbar puncture and a psychiatric evaluation. On the first day of testing, Dr. Silverman's note that "an acute psychotic episode [must] be ruled out" indicated both the possible seriousness of Howard's condition and the need for further testing before a complete diagnosis could be made. (J.A. at 153, 158.) Dr. Lessem diagnosed Howard on December 17, 2002 as having "atypical psychosis," determined that Howard should be transferred to 4 East, and instructed 4 East doctors to take "suicide precautions." (J.A. at 173.) A legitimate possibility that the patient might commit suicide would appear to "place the health of the individual . . . in serious jeopardy," and could thus fall under the category of "emergency medical condition." *See* § 1395dd(e)(1)(A)(i). It is noteworthy that Dr. Lessem recommended Howard be transferred to 4 East, the unit for patients "who are acutely mentally ill." (J.A. at 160.) This evidence supports Plaintiff's claim that the hospital physicians believed Howard had an emergency medical condition upon his admission.

## B.     Howard's Condition Upon Discharge

Defendants argue further that, to the extent that Howard had an emergency medical condition at the time of his admission, the hospital physicians no longer believed that he had such a condition when they released him–i.e., that he was stable upon

---

[1]To the extent Plaintiff argues that the hospital's physicians were negligent in failing to recognize that Howard had an emergency medical condition, such an allegation is reserved for state malpractice law. *See, e.g., Bryant v. Adventist Health Sys.*, 289 F.3d 1162, 1166 (9th Cir. 2002).

discharge.  In *Cleland*, this Court, in affirming summary judgment for the defendant, explained why it was clear that the responsible doctors reasonably believed the patient had been stable upon discharge:

> To all appearances, the plaintiff's condition was stable.  He was not in acute distress, neither the doctors nor the patient or his parents made the slightest indication that the condition was worsening in any way, or that it presented any risk that might become life-threatening, or that it would worsen markedly by the next day.

917 F.2d at 271.

Plaintiff has introduced evidence that challenges whether any of these signs of stability noted in *Cleland* existed with respect to Howard.  First,  the "final diagnosis" of Howard upon discharge of an "atypical psychosis [with] delusional disorder" was substantially the same as Dr. Lessem's diagnosis on December 17, 2002, which included "atypical psychosis." (J.A. at 169, 178.)  Moreover, Dr. Bursztajn's report concludes that "the symptoms and mental state described by Dr. Lessem could not be resolved in one to two days, yet the decision to discharge Mr. Howard was made one day later." (J.A. at 68-69.)  The doctors were aware on the day they released Howard that Howard's wife did not think he had improved, and in fact still "fear[ed] him."  (J.A. at 219.) Finally, Dr. Lessem's note dated December 17, 2002, in which he writes "will accept [Howard] to 4 east if [Howard]'s insurance will accept criteria" (J.A. at 172), creates at the very least a credibility issue with respect to whether the hospital physicians actually believed that no emergency condition existed upon Howard's release.

To support their argument, Defendants cite Dr. Mitchell's progress note dated December 18, 2002, which states, "[Howard's] affect is brighter.  No physical symptoms now.  [He] wishes to go home, wife fears him.  Denies any suicidality." (J.A. at 219.) Defendants also cite Dr. Mitchell's progress report dated December 19, 2002 stating that Howard "cannot stay as he is medically stable and now does not need 4 [East]." (J.A. at 89.)  First, these notes do not refute Plaintiff's evidence that *Dr. Lessem* believed Howard was still unstable at the time of his release.  But more importantly, while these notes may arguably provide a basis for a jury to find for Defendants, for the reasons

discussed, Plaintiff's evidence still raises a dispute of fact with respect to whether Howard had an emergency condition on the day of his release, and what the hospital's doctors believed when they released him.

Because issues of fact exist relating to Howard's medical condition–upon his initial screening as well as prior to his release–the district court erred in granting summary judgment on this ground.

## VI.     Plaintiff's EMTALA Claim Against Dr. Lessem

Plaintiff has brought suit against both the hospital and Dr. Lessem.  EMTALA's provision authorizing private suits expressly allows claims "against the participating hospital," but does not refer to claims against individuals.  42 U.S.C. § 1395dd(d)(2)(A). Although the question of whether EMTALA allows a private right of action against an individual physician is one of first impression for this Court, other circuits to have considered the issue have held or opined that EMTALA does not authorize an action against an individual physician.  *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 877-78 (4th Cir. 1992); *King v. Ahrens*, 16 F.3d 265, 271 (8th Cir. 1994); *Eberhardt v. City of L.A.*, 62 F.3d 1253, 1256-57 (9th Cir. 1995); *Delaney v. Cade*, 986 F.2d 387, 393-94 (10th Cir. 1993); *Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1040 n.1 (D.C. Cir. 1991) (*dicta*).

We agree with our sister circuits that EMTALA does not authorize a private right of action against individuals.  "The question of the existence of a statutory cause of action is, of course, one of statutory construction."  *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979).  It is possible that Congress meant to include individual physicians in the civil enforcement provision and simply neglected to do so; however, in comparing the civil enforcement provision with the government enforcement provision that precedes it, the omission of any reference to physicians in the civil enforcement provision appears intentional.  The government enforcement provision authorizes the Department of Health and Human Services to commence its own actions against violators of EMTALA.  42 U.S.C. § 1395dd(d)(1).  Unlike the civil enforcement provision, the provision authorizing government enforcement expressly states that "any

physician who is responsible for the examination, treatment, or transfer of an individual in a participating hospital, including a physician on-call for the care of such an individual, and who negligently violates a requirement of this section . . . is subject to a civil penalty" and exclusion from further participation in government programs. § 1395dd(d)(1)(B).  As previously discussed, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello*, 464 U.S. at 23.  Congress clearly knew how to make individuals responsible under the statute, because it did so in the provision subjecting violators to federal enforcement.  Given the contrast in these two consecutive subsections of the statute, Congress' omission of any reference to individuals in the civil enforcement provision must have been intentional.

Moreover, to the extent that the absence of such a reference arguably causes ambiguity with respect to this issue, the legislative history reveals an intent to preclude private suits against individuals.  According to the report of the House Judiciary Committee, the committee recommended amendments changing the civil enforcement provision to its current form in order to "clarif[y] that actions for damages may be brought only against the hospital which has violated the requirements of [the statute]." H.R. Rep. No. 99-241, pt. 1, at 132, *reprinted in* 1986 U.S.C.C.A.N. 579, 728.  No other statement from Congress suggests any alternative reading of the provision.  Because the statute contains no language plainly at odds with this stated purpose, we view the Judiciary Committee's report as further support for our conclusion that private plaintiffs may not sue  individuals under EMTALA.

Thus, the district court's grant of summary judgment dismissing Plaintiff's claim against Dr. Lessem pursuant to EMTALA is affirmed.

## CONCLUSION

For the reasons set forth above, with respect to Plaintiff's claims against the hospital, the judgment of the district court is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion. With respect to Plaintiff's claim against Dr. Lessem pursuant to EMTALA, the district court's order granting summary judgment is **AFFIRMED**.