NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0420n.06

No. 09-6026

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
**Jul 13, 2010**
LEONARD GREEN, Clerk

HOWARD DEAN GIPSON,                        )
                                          )
    Plaintiff-Appellant,               )
                                          )
v.                                        )
                                          )  On Appeal from the United States
VOUGHT AIRCRAFT INDUSTRIES, INC.          )  District Court for the Middle
                                          )  District of Tennessee
    Defendant-Appellee.                )
                                          )
                                          )

Before:  BOGGS, ROGERS, and COOK, Circuit Judges.

**BOGGS, Circuit Judge.**  Plaintiff Howard Dean Gipson appeals the district court's grant

of summary judgment to defendant Vought Aircraft Industries, Inc. with respect to Gipson's claims

under the Family and Medical Leave Act.  For the reasons described below, we affirm.

**I.  BACKGROUND**

**A.  Underlying Facts**

Plaintiff Howard Dean Gipson was formerly employed as a plant maintenance worker for

defendant Vought Aircraft Industries, Inc. in Nashville, Tennessee.  Gipson also served as president

of the local union.  In late 2004, Gipson underwent triple-bypass heart surgery.  At that time, he

properly invoked the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601-2654,

to take medical leave, and he returned to work uneventfully.

In or about October 2005, Gipson was removed from his position as union president. In late January 2006, while the removal was still under appeal, Gipson's successor removed Gipson's personal effects from the union office in the Vought plant's Human Resources department, placed them in the adjacent lobby, and asked Gipson to retrieve them. He did not.

On January 26, 2006, Gipson arrived at work feeling "decent." At the beginning of Gipson's shift, his supervisor, Charlie King, instructed Gipson to remove his effects from the Human Resources lobby. Half an hour later, when Gipson still not had complied, King repeated the instruction; again, Gipson did not obey. He concedes that he did not feel ill at the time and could have physically performed this task. King reported Gipson's noncompliance to his own supervisor, Ed Young.

Subsequently, King asked Gipson a third time to remove his effects. This time, Gipson replied that this was a union-related matter and stated that he would not comply without a written order. King responded, "I'm giving you a direct order to go do it," became red-faced and loud, and warned that if Gipson did not comply, he would be subject to disciplinary action, up to and including discharge. According to Gipson, King also said, "I'm not giving you a damn [written order]." At this point, Gipson subjectively began to feel unwell; he alleges that King's behavior exacerbated his underlying heart condition. However, he did not complain about his health or otherwise indicate he needed medical attention. Rather, he simply walked away.

At some point thereafter, Gipson requested a pass to go to First Aid, which he alleges that King denied. Gipson does not claim that he told King why he needed the pass; nor does he allege that he mentioned any specific medical symptoms or that he voiced his belief that his discomfort was

connected to his underlying heart condition. He went to First Aid anyway, where a nurse checked his blood pressure and found that it was "a little high, but nonetheless within normal limits." Gipson asked the nurse for permission to go home but was told that he had to obtain authorization from his supervisor. Gipson does not claim that he told the nurse about any specific symptoms or that he mentioned his heart condition.

On the way back from First Aid, Gipson asked Robert Hinson, the safety committeeman for the union, to call King and request a medical pass for Gipson; he allegedly told Hinson that he intended to use the pass to go home and get his medicine or see his doctor. Gipson does not claim that he told Hinson what medicine he required or what his particular ailment was.

When Gipson returned to the maintenance department, he told King that he was in pain and needed to go home to get his medication; once again, he does not claim to have described the pain or identified the medicine. King said that Gipson could not leave "until we take care of business." At that point, King's supervisor, Young, arrived. According to King and another employee who witnessed the exchange, Young asked Gipson to turn in his employee badge and offered to give Gipson a medical pass once he had done so.[1] The employee witness testified that Gipson told King and Young, "That's not the proper procedures" and "That's not the way you do it." Gipson acknowledges that he heard "something to that effect about a badge," but did not comprehend that he was being offered a medical pass because his headache kept him from thinking clearly.

---

[1] King testified that the reason for this was to force Gipson to check in through the human resources department upon returning to the plant, presumably to attend to his personal effects still located there.

At that point, Maxie Garrett, the plant human resources manager, arrived. Garrett told Gipson to come with him and retrieve his personal effects from the human resources lobby, but Gipson declined to do so, stating for the first time that he had a "very bad headache." Gipson admits that Garrett gave him a direct order to move his belongings and that he did not comply. Garrett then turned to King and Young and asked if they had witnessed Gipson refuse a direct order; they replied that they had. Garrett then terminated Gipson for insubordination.

Thereafter, Gipson walked to his car (located approximately 20-25 minutes away on foot) and drove himself to his doctor's office in Lebanon, Tennessee (about 30 miles from the plant). Once there, he did not receive immediate medical attention; rather, he made an appointment for a date three weeks in the future. He then went home.

Subsequently, Gipson grieved his termination under the procedures provided in the applicable collective bargaining agreement. The grievance proceeded to arbitration, and a full hearing was held, including examination and cross-examination of multiple witnesses. The arbitrator upheld the termination as "premised upon 'proper cause,'" finding, in relevant part:

> [Gipson] did violate Work Rule 23 on January 26, 2006, as is charged, and . . . committed the offense of insubordination in his repeated failures and refusals to obey the unambiguous "direct orders" of no fewer than three (3) different supervisory personnel.
>
> * * *
>
> [T]he "direct orders" that were repeatedly given to [Gipson] were completely unambiguous that he must promptly retrieve his personal possessions from the human resources lobby. . . . [Gipson's] sole retort – other than with respect to his alleged medical problem, a matter discussed below – was to the effect that Management should refrain from meddling in the internal affairs of the Local Union, inasmuch as his personal belongings had apparently been ejected from the Local

Union's offices following a change of command, and while that matter was still being contested. While [Gipson's] reluctance to [comply] may have been the result of his unwillingness to appear to have conceded the propriety of his removal from his Union position, such a sentiment did not entitle him to disobey the clear directives of the Employer.

\* \* \*

The undersigned Arbitrator is keenly aware of the risks associated with heart disease, having lost his own father during a triple bypass procedure in 2001. Such a sympathetic predisposition, however, should not be confused with naivete. [Gipson] himself expressed no physical discomfort to anyone until, suspiciously, the moment when he was first [sic] ordered to retrieve his effects. Plainly, from his commentary to [a co-worker] that the matter was a Local Union issue and "none of . . . [the Company's] concern," [Gipson] was simply nettled that he was being forced to remove his belongings, an unwillingness which entirely explains his coincident, subjective and sudden onset of claimed physical distress. Any lingering doubt as to his possible veracity in this respect was completely resolved by the testimony of [the nurse], who related that [Gipson] displayed and expressed irritation with his supervisor, that she nevertheless took [his] blood pressure, and that the same seemed to be only slightly elevated. The totality of this evidence, in the opinion of the Arbitrator, inescapably yields the conclusion that [Gipson] was shamming a physical ailment [on] January 26, 2006, so as to evade the command to perform a task which he found to be distasteful.

## B. Procedural History

Gipson filed a complaint in Tennessee state court on January 17, 2007, alleging that Vought violated the FMLA by refusing Gipson's request for medical leave and terminating him in retaliation for exercising his rights under the FMLA. Vought removed the complaint to federal court.

During discovery, Gipson's Federal Rule of Civil Procedure 26(a)(1) initial disclosures identified "Benny Riggins" or "Wiggins" as an individual likely to have unspecified discoverable knowledge or information. In response to Vought's interrogatory asking Gipson to give a description of this relevant knowledge, Gipson replied only that this individual "told [Gipson] to go to first aid

*if* he was suffering chest pains" (emphasis added). Gipson did not identify Riggins/Wiggins in response to Vought's subsequent interrogatories asking Gipson (1) to "identify any and all witnesses to each [of Vought's alleged wrongful] 'act[s]' or 'omission[s]'" and (2) to "set forth in detail . . . any and all witnesses to [Gipson's claimed] exercise of rights [under the FMLA]." Vought did not seek to depose this individual. Discovery closed on December 12, 2007.

Thereafter, Vought filed a motion for summary judgment. Gipson accompanied his response with an affidavit sworn by Benny Wigginton, a secretary in Vought's maintenance department. (Wigginton is clearly the "Benny Riggins"/"Wiggins" identified in Gipson's initial disclosure and interrogatory response.) The Wigginton affidavit bore a stamp indicating that it had been notarized over two months prior to the close of discovery. In the affidavit, Wigginton averred, in relevant part:

> 4. During the course of my employment I was sitting at my desk working when I saw Howard Dean Gipson. I heard Mr. Gipson say that his chest hurt and he was not feeling well. I told him to go to the First Aid Department.
>
> * * *
>
> 8. [Later,] Mr. Gipson stated [to Maxie Garrett] that he could not [pick up his effects from the human resources department] now because he wanted to get his medicine. He was taking Nitroglycerin to ease the pain and needed to get them.
>
> 9. Mr. Gipson asked if he could go get his medicine first and Mr. Garrett said no, to go and get the papers right then.

Vought moved to strike the Wigginton affidavit pursuant to Federal Rule of Civil Procedure 37. On October 17, 2008, the district court held that Rule 37 sanctions were warranted because Gipson had not disclosed during discovery the extent of Wigginton's purported knowledge; it therefore ordered stricken from the record the portions of the Wigginton affidavit that went beyond

Gipson's interrogatory responses (i.e., everything but the statement that Wigginton had "told [Gipson] to go to first aid if he was suffering chest pains").

On July 29, 2009, the district court granted summary judgment to Vought. Gipson timely filed a notice of appeal from the order granting summary judgment; the notice stated that Gipson was appealing "the Order of [the district court] dated July 29, 2009, wherein Judge Nixon granted the defendant's motion for summary judgment and dismissed plaintiff's claims." It did not mention the October 17, 2008 order striking portions of the Wigginton affidavit.

## II. STANDARD OF REVIEW

We review for abuse of discretion a district court's decision to exclude evidence under Rule 37 as a sanction for discovery noncompliance. *River City Capital, L.P. v. Bd. of County Comm'rs, Clermont County*, 491 F.3d 301, 309 (6th Cir. 2007). We review a district court's grant of summary judgment de novo. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, 'show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.'" *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 578 (6th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). In reviewing the district court's decision, we view all evidence in the light most favorable to, and make all reasonable inferences in favor of, the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

No. 08-2532
*Gipson v. Vought Aircraft Industries, Inc.*

## III. ANALYSIS

### A. The District Court's Decision To Strike the Wigginton Affidavit

**1. *Do We Have Jurisdiction?***

Gipson argues that "[the district court's] striking of the essential parts of the Wigginton Affidavit was . . . [an] abuse[] of discretion." Appellant Br. at 9. In response, Vought argues that we lack jurisdiction over this issue because Gipson did not specifically mention the district court's order striking those parts of the Wigginton affidavit in his notice of appeal.

An appellant's notice of appeal must, among other things, "designate the judgment, order, or part thereof being appealed." Fed. R. App. P. 3(c)(1)(B). This rule "imposes jurisdictional requirements that this court cannot waive," *Martin v. Gen. Elec. Co.*, 187 F. App'x 553, 557 (6th Cir. 2006), and we have stated that "strict obedience to Rule 3(c) is warranted," *United States v. Glover*, 242 F.3d 333, 335 (6th Cir. 2001). At the same time, it is "well settled that an appeal from a final judgment draws into question all prior non-final rulings and orders" on which the final judgment depends. *Westerfield v. United States*, No. 08-4458, 2010 WL 653535, at *4 (6th Cir. Feb. 24, 2010) (quoting *McLaurin v. Fischer*, 768 F.2d 98, 102 (6th Cir. 1985)); *see also Greer v. St. Louis Reg'l Med. Ctr.*, 258 F.3d 843, 846 (8th Cir. 2001) ("Ordinarily, a notice of appeal that specifies the final judgment in a case should be understood to bring up for review all of the previous rulings and orders that led up to and served as a predicate for that final judgment."); *Pacitti v. Macy's*, 193 F.3d 766, 776 (3d Cir. 1999) (holding that notice of appeal mentioning only order granting summary judgment also authorizes appellate review of earlier discovery order); 16A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure (4th ed.) § 3949.4 ("A notice of appeal that names the final

judgment suffices to support review of all earlier orders that merge in the final judgment under the general rule that appeal from a final judgment supports review of all earlier interlocutory orders.").

Vought relies on two cases, *United States v. Glover* and *Martin v. General Electric Co.*, where we found that we lacked jurisdiction over orders not explicitly mentioned in a notice of appeal. However, those cases are distinguishable.

In *Glover*, after the defendant was convicted of failure to pay child support, the district court ruled for the defendant on a contested aspect of the restitution determination. Following entry of final judgment, the government filed a notice of appeal stating only that the government "hereby request [sic] a Protective Notice of Appeal in this Matter." 242 F.3d at 334. We held that such a vague statement, which "provide[d] not even a clue as to what the Government [sought] on appeal," did not give us jurisdiction to hear the government's appeal of the restitution ruling. *Id.* at 336-37 (stating that "no amount of liberal construction of the Rules can show that the Government's notice of appeal complied with the requirements of Rule 3(c)"). Here, unlike in *Glover*, Gipson did not leave his notice of appeal entirely open-ended; rather, he specifically identified the district court's final order granting summary judgment, which clearly authorizes us to review that final judgment. The "well settled" doctrine that appeal from a final judgment embraces all related non-final orders gives us jurisdiction over the remainder of Gipson's appeal.

In *Martin*, the district court had granted summary judgment to the defendant and, in a later order, imposed monetary sanctions on the plaintiff. The plaintiff's notice of appeal was filed between the issuance of the two orders; as such, while it mentioned the former order, it obviously did not mention the latter, which did not exist when the notice of appeal was filed. On appeal, the

plaintiff argued that the district court had erred both in granting summary judgment and in imposing sanctions. We held that "Martin ha[d] not perfected her appeal from the district court's order awarding sanctions" because she had "fail[ed] either to identify the motion for sanctions in her notice of appeal or to file a new notice of appeal . . . ." 187 F. App'x at 557 (citation omitted). In this case, on the other hand, the order striking the Wigginton affidavit is a "*prior* non-final ruling[]" in existence at the time the notice of appeal was filed. *Westerfield*, 2010 WL 653535, at *4 (emphasis added). Moreover, the discovery order at issue in this case, unlike the monetary sanctions order in *Martin*, "served as a predicate for [the] final judgment." *Greer*, 258 F.3d at 846. Accordingly, *Martin* is equally inapplicable to the situation at hand.

We therefore have jurisdiction to consider Gipson's assertion that the district court abused its discretion by striking most of the Wigginton affidavit.

### 2. *Propriety of the District Court's Order*

Under Rule 26, "a party must, without awaiting a discovery request, provide to the other parties . . . the name . . . of each individual likely to have discoverable information – *along with the subjects of that information* – that the disclosing party may use to support its claims or defenses . . . ." Fed. R. Civ. P. 26(a)(1)(A)(i) (emphasis added). Further, "[a] party who has made a disclosure under Rule 26(a) . . . or who has responded to an interrogatory . . . must supplement . . . its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect . . . ." Fed. R. Civ. P. 26(e)(1). "If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that

information . . . to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Gipson's initial disclosures simply stated that Wigginton (a.k.a. "Riggins"/"Wiggins") "told [Gipson] to go to first aid *if* he was suffering chest pains" (emphasis added). Gipson never supplemented this disclosure to inform Vought that Wigginton had heard Gipson inform anyone in his chain of command that he *was in fact* suffering chest pains or that he was taking nitroglycerin – even though such information would clearly be relevant to Gipson's claims. Moreover, Gipson never supplemented his interrogatory responses, which failed to mention Wigginton altogether in response to Vought's request (1) to "identify any and all witnesses to each [of Vought's alleged wrongful] 'act[s]' or 'omission[s]'" and (2) to "set forth in detail . . . any and all witnesses to [Gipson's claimed] exercise of rights [under the FMLA]." Accordingly, the district court correctly found that Gipson "fail[ed] to provide information . . . as required by Rule 26(a) or (e) . . . ."

Moreover, Gipson's failure was neither "substantially justified" nor "harmless." Because the Wigginton affidavit apparently existed months before the close of discovery, Gipson was already aware of the extent of Wigginton's purported knowledge at that time; therefore, there is no evident justification for his decision to omit it. And Gipson's omission harmed Vought's trial preparation, because "even if [Vought] might otherwise have been prudent to investigate [Wigginton]'s knowledge," Gipson's omission certainly "suggested to them that such investigation might have been a waste of resources." *Caudell v. City of Loveland*, 226 F. App'x 479, 481 (6th Cir. 2007). While discovery could theoretically have been reopened to allow Vought to depose Wigginton, the "delay"

that this would have caused is an "additional harm" stemming from Gipson's totally unjustified omission. *Id.* at 482.

The district court therefore did not abuse its discretion in striking portions of the Wigginton affidavit.

## B. Gipson's FMLA Claims

The FMLA affords an eligible employee up to twelve weeks of leave within a twelve-month period when the employee suffers from "*a serious health condition* that makes the employee *unable to perform the functions of . . . [his] position*." 29 U.S.C. § 2612(a)(1)(D) (emphases added).[2]  A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves . . . (A) inpatient care in a hospital, hospice, or residential medical care facility or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11); *see also* 29 C.F.R. §§ 825.114, 825.115 (defining "inpatient care in a hospital, hospice, or residential medical care facility" and "continuing treatment by a health care provider").

Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise [the] right" to such leave. 29 U.S.C. § 2615(a)(1).  It is also "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA.  *Id.* § 2615(a)(2).  Gipson alleges that Vought violated both of these provisions.  We address them in turn.

_____

[2] Congress amended certain relevant sections of the FMLA as of January 2009.  The district court decided Vought's motion under the statutory language in effect at the time the underlying events took place.  On appeal, neither party disputes that this was proper.  Consequently, we do the same.

1. *Unlawful Denial of FMLA Leave*

For an FMLA denial-of-leave claim to lie, the employee must have given sufficient notice to apprise the employer that his request for leave was FMLA-qualifying. *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004). While "the eligible employee need not expressly mention the FMLA as the source of his right to request such leave," *ibid.*, "the employee must give 'the employer enough information for the employer to reasonably conclude that an event described in FMLA § [2612(a)(1)(D)] has occurred,'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 486 (6th Cir. 2005) (quoting *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999)). In other words, "the information that the employee conveyed to the employer [must have been] reasonably adequate to apprise the employer of the employee's request to take leave *for a serious health condition* that rendered him *unable to perform his job*." *Brenneman*, 366 F.3d at 421 (emphases added); *see also Walton*, 424 F.3d at 486.

Here, the district court correctly held that no reasonable jury could conclude that Gipson gave sufficient notice to invoke his rights under the FMLA. The record discloses that Gipson (1) requested a pass to go to the infirmary from Charlie King; (2) had his blood pressure checked, with a result that was "a little high, but nonetheless within normal limits"; (3) told Robert Hinson that he wanted a pass to go home and get his medicine or see his doctor; (4) told King that he was in pain and needed to go home to get his medicine; and (5) told Maxie Garrett that he had a "very bad headache." Even giving Gipson the benefit of the doubt, these facts would not reasonably inform Vought that Gipson was presently suffering from "an illness, injury, impairment, or physical or mental condition that involves . . . (A) inpatient care in a hospital, hospice, or residential medical

care facility or (B) continuing treatment by a health care provider" as defined in the applicable regulations. 29 U.S.C. § 2611(11). *See, e.g.*, *Walton*, 424 F.3d at 486 (employee's statements that he was "sick" and had scheduled a doctor's appointment not sufficient notice); *Phillips v. Quebecor World RAI, Inc.*, 450 F.3d 308, 311-12 (7th Cir. 2006) (employee's statement that she was "sick" and had been seen at health center not sufficient notice); *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 980 (5th Cir. 1998) (employee's mother's statements that employee "was sick," "was having a lot of pain in her side," and would not be able to work not sufficient notice); *cf. Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003) (holding that notice *was* sufficient where employee informed employer that he had been in motorcycle accident which required hospitalization and that he would be unable to perform his job).[3]

Gipson responds that this case is distinguishable because "Vought knew that . . . Gipson had undergone triple bypass heart surgery less than two years before the firing." Appellant's Br. at 12. This argument, however, is unavailing. While Gipson indeed exercised FMLA leave in connection with *the surgery itself*, the record contains no evidence that Vought was on notice that Gipson had *ongoing* heart problems for which he was receiving continuing treatment. Therefore, Vought cannot be charged with knowledge that Gipson's headache and other unspecified pain was related to such

---

[3] Gipson's statement that he needed his "medicine" does not change this result. Other than the reference to nitroglycerin in the stricken Wigginton affidavit, there is no evidence that Gipson mentioned what medicine he needed, and even the Wigginton affidavit is ambiguous as to whether Gipson *actually stated at the time* that he was taking nitroglycerin. Because "the taking of over-the-counter medications . . . is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave," 29 C.F.R. § 825.113(c), a bare reference to "medicine" cannot constitute sufficient notice.

a condition.[4] *See Brenneman*, 366 F.3d at 424 n.9 (rejecting argument that, because "defendant knew the plaintiff has diabetes and that plaintiff had FMLA-qualifying, diabetes-related absences [in the past]," material issue of fact existed as to whether employer had sufficient notice that later absence was also diabetes-related, where plaintiff stated only that he "wasn't doing well" that day); *Layman v. C & D Techs., Inc.*, No. 1:03-cv-275, 2004 U.S. Dist. LEXIS 27696, at *36 (E.D. Tenn. Nov. 4, 2004) ("That C & D was aware of Layman's prior medical condition [for which she used FMLA leave] is inconsequential: Layman still failed to provide C & D any information from which it could conclude that the May 2002 illness [at issue] was related to her previous condition.").

Because Gipson did not, as a matter of law, give the requisite notice to trigger his right to leave under the FMLA, Vought did not "interfere with, restrain, or deny the exercise of or the attempt to exercise [his] right" to such leave.[5]

### 2. *Unlawful Retaliation Under FMLA*

To establish a claim of unlawful retaliation under the FMLA, a plaintiff must show (1) that "he availed himself of a protected right under the FMLA by notifying [his employer] of his intent to take leave," (2) that "he was adversely affected by an employment decision . . . ," and (3) "a causal connection between his exercise of a right under the FMLA and the adverse employment

---

[4] The only evidence that Gipson had actually claimed to be experiencing *chest* pain appeared in the stricken portion of the Wigginton affidavit.

[5] The district court also held that Vought did not unlawfully deny Gipson FMLA leave because Young offered to give Gipson a medical pass once he had turned in his employee badge. Because we need not reach this alternative justification for affirmance, we do not address it.

decision." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001). Gipson's retaliation claim must fail because, as we have held, Gipson did not "avail himself of a protected right under the FMLA" by giving notice sufficient to apprise Vought that he was suffering from an FMLA-qualifying condition. *Cf. Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (stating that, in Title VII retaliation context, no retaliation claim will lie unless employer "understood, or could reasonably have understood, that the plaintiff's opposition was *directed at conduct prohibited by Title VII*." (emphasis added)).

Furthermore, even if Gipson *had* properly invoked his FMLA rights, no reasonable jury could find that there was a causal connection between that exercise of rights and his termination. As we have stated, an employee may not insulate himself from a pending dismissal by opportunistically invoking the FMLA. *See Moorer v. Baptist Mem. Health Care Sys.*, 398 F.3d 469, 488-89 (6th Cir. 2005). Where, as here, the employer claims that "the dismissal would have occurred regardless of the employee's request for . . . FMLA leave," the employee must convince the trier of fact otherwise. *Id.* (quoting *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)).

Gipson cannot make such a showing on this record. He admits in his own brief that he "flatly disobeyed [the] direct order" of his superiors, which is indisputably grounds for termination. Appellant's Br. at 12-13. The arbitrator found that Gipson "did violate Work Rule 23 . . . [by] committ[ing] the offense of insubordination" and concluded that "the termination was premised upon 'proper cause.'"[6] In particular, Gipson did not comply with King's first three requests to move his

---

[6] Gipson asserts that the district court erred by citing the arbitrator's findings in support of its grant of summary judgment, since, as a categorical matter, "arbitration proceedings and civil trials

personal effects, all of which were issued *before* Gipson had voiced his medical concerns to anyone.

On the third such occasion, King had stated that he was "giving [Gipson] a direct order to go do it"

and threatened Gipson with termination if he did not comply. Although it was not until after Gipson

had requested a medical pass that Garrett actually *issued* that termination, "the 'wheels of

termination' had already been put into motion before [Gipson] requested leave." *Kennebrew v. New

York City Hous. Auth.*, No. 01-CIV-1654, 2002 WL 265120, at *20 (S.D.N.Y. Feb. 26, 2002)

(quoting *Tuberville v. Personal Fin. Corp.*, No. 3:95CV150, 1996 WL 407571, at *3 (N.D. Miss.

June 5, 1996)). A reasonable jury could not conclude that it was Gipson's request for a medical pass,

rather than Gipson's continuing insubordination, that provoked his firing.

### CONCLUSION

The district court's orders striking portions of the Wigginton affidavit and granting summary

judgment to Vought are **AFFIRMED**.

---

are simply too different." Appellant's Br. at 14. This misstates the law; a district court may indeed admit arbitration findings as evidence under certain circumstances. *See Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 549 (6th Cir. 2008). In any event, even if the arbitrator's findings were disregarded entirely, the record would still support affirmance.